UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| D.C.B., minor child, and Mr. B., his father, | Case No.  2:25-cv-1924 |
| *Plaintiffs*, | |
| v. | |
| United States of America, | |
| *Defendant*. | |

## COMPLAINT

## INTRODUCTION

1.     This matter concerns a cruel and inhumane policy crafted, issued, and carried out by the first Trump Administration's Department of Homeland Security ("DHS"), Department of Health and Human Services ("HHS"), and subsidiary agencies/offices to forcibly separate asylum-seeking parents from their children as part of the Administration's efforts to systemically terrorize and punish those vulnerable migrants exercising their right under the asylum statute to seek the protection of the United States. Defendant's improper purpose was to thereby deter future migration to the United States. The implementation of the family separation policy and the corresponding long-term separation and isolation of children from their parents had the intended effect of causing extraordinary and profound trauma

to thousands of families, including Plaintiffs, Mr. B. and his child, then-six-year-old D.C.B., in a manner that meets the U.S. statutory and international law definitions of torture, *i.e.*, the intentional infliction of severe physical or mental pain or suffering.[1] The trauma suffered by Plaintiffs and other parents and children was no incidental byproduct of the policy. It was the point.

2.      Moreover, consistent with the Trump Administration's well documented animus directed toward non-white migrants, the policy was geared at punishing asylum seekers from Central America, as approximately 95% of the children separated arrived from Latin America, the originating region of Plaintiffs. Approximately 90% of all the children separated arrived from just three countries: Guatemala, El Salvador, and Honduras.[2] Moreover, the majority of migrants targeted by this policy are Indigenous peoples, Afro-descendants, or belong to ethnic and racial groups that are often categorized as non-white in the United States. As such, the policy was intended to deny and did deny Plaintiffs' fundamental constitutional rights and rights under international law, including the

---

[1] *See, e.g.*, OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09- 18-00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY (Sept. 2019), https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf.

[2] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-20-245, SOUTHWEST BORDER: ACTIONS NEEDED TO IMPROVE DHS PROCESSING OF FAMILIES AND COORDINATION BETWEEN DHS AND HHS (Feb. 2020) at 20, 92-93, https://www.gao.gov/assets/710/704683.pdf; *see also* ACLU, *Family Separation by the Numbers*, https://www.aclu.org/issues/family-separation.

right to family integrity, on a discriminatory basis on such a widespread and systematic scale as to constitute the crime against humanity of persecution.

3.     The Administration made clear that they intended to exploit the trauma resulting from family separations, and media reporting about that trauma, to deter future asylum seekers, particularly parents and children, at the United States' southern border with Mexico, and thus fundamentally undermine this country's 70-year-old asylum system, which implements the U.S.' international and domestic legal obligations to asylum-seekers. Federal officials at the highest levels made repeated public statements acknowledging the policy's purpose.

4.     Despite widespread condemnation and a federal court injunction in *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F. Supp. 3d 1133, 1137 (S.D. Cal. 2018), which required Immigration and Customs Enforcement ("ICE") to reunite separated families and stop further separations, as well as an abundance of scientific and medical evidence documenting the trauma associated with forced family separation, the Trump Administration continuously contended that separating parents from children at the U.S.-Mexico border was somehow necessary to protect national security. The Administration thus deliberately subjected thousands of vulnerable people, including thousands of children, to a brutal and traumatizing campaign of physical and psychological harm to achieve narrow—and unlawful—policy goals.

5.      Officially, the federal government has admitted to separating at least 4,368 children from their parents or guardians after they crossed the U.S. southern border.[3] However, the number of families separated is likely thousands higher, in part due to lax, if not intentionally deceptive, record-keeping failures of several government agencies.[4]

6.      After tearing children away from their parents, DHS agents inflicted further terror and trauma on families by delaying and failing to provide information regarding each other's whereabouts and well-being to distraught

---

[3] Kristina Davis, *U.S. officials say they are highly confident to have reached tally on separated children: 4,368*, L.A. TIMES (Jan. 18, 2020), https://www.latimes.com/world-nation/story/2020-01-18/u-s-officials-say-they-are-highly-confident-to-have-reached-tally-on-separated-children-4-368. *See also* Joint Status Report at *1, *10, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18cv00428 DMS (MDD) (S.D. Cal. Sept. 9, 2019), ECF No. 465 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has so far acknowledged an additional 986 children as part of the expanded class); *see also* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-Bl-18-00511, SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE (Jan. 17, 2019) at 11, https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf [hereinafter HHS OIG REPORT I]; S. Poverty L. Ctr., *Family separation under the Trump administration – a timeline* (June 17, 2020), https://www.splcenter.org/news/2020/06/17/family-separation-under-trump-administration-timeline#2020.

[4] *See* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC. OIG-20-35, CBP SEPARATED MORE ASYLUM-SEEKING FAMILIES AT PORTS OF ENTRY THAN REPORTS AND FOR REASONS OTHER THAN THOSE OUTLINED IN PUBLIC STATEMENTS (May 29, 2020) at 11, *available at* https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-35-May20.pdf ("[W]e encountered data reliability issues calling into question DHS' ability to accurately identify and address all family separations prior to June 2018. Before then, OFO's system for tracking [noncitizens] at the ports of entry included a data field that could be used to indicate a child was held separately from his or her parent. However, OFO officials said staff did not use the data field consistently, and as a result, OFO could not provide a reliable number of families separated before June 2018."). *See also* HHS OIG REPORT I, *supra* note 3, at 1, 6, 13 (reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in *Ms. L.*]").

parents, their children and family members. Defying the consensus of expert opinion[5] and Defendant's legal obligations pursuant to the *Flores* Settlement Agreement, not to mention basic human decency, DHS also systemically refused to facilitate adequate communication between the parents and children during their separation.

7.      DHS, along with the Department of Health and Human Services' Office of Refugee Resettlement (ORR), the agency charged with taking custody of the separated children, likewise failed to implement any system for tracking the children to ensure that the families could be reunited. All this was done without even the merest pretense that the parent posed a danger to the child, one of the only lawful bases for separation.

8.      The intentional infliction of such severe mental and physical trauma on asylum-seeking parents and children is at the crux, and was the intent, of the government's family separation policy. As the Special Rapporteur on Torture has explained, its implementation constitutes torture because the harm was inflicted, in this case and in others, "for the purpose of deterring, intimidating or punishing migrants or their families [or] coercing them into withdrawing their requests for

---

[5] *See* report by Physicians for Human Rights, *"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation* (Feb 2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf ; APA's May 30, 2018 statement, Am. Psychiatric Assoc., *Statement of APA President Regarding the Traumatic Effects of Separating Immigrant Families* (May 29, 2018), https://www.apa.org/news/press/releases/2018/05/separating-immigrant-families.

asylum."[6] Seeking asylum is a lawful process that all persons are entitled to seek, upon reaching the United States. Family separation was intended to coerce frightened parents and vulnerable children to give up their statutory right to seek protection, and to be safe from physical harm, persecution and torture.

9.      Plaintiffs fell victim to the Administration's family separation policy. U.S. government officials forcibly seized then-6-year-old D.C.B. from Mr. B's custody and separated them for over four weeks until their reunification. Throughout this forced separation, the government provided Mr. B only limited information about his child's whereabouts and well-being, and afforded Mr. B limited opportunities to directly communicate with his child.

10.     The separation caused Mr. B unbearable anguish and grief as well as fear for his child's mental, emotional, and physical well-being, an enduring trauma which continues today. The separation furthermore caused D.C.B. unbearable anguish and grief as well as fear; he continues to suffer effects to this day. As a result of ICE's actions, Plaintiffs suffered and continue to suffer substantial and ongoing mental and emotional trauma.

11.     ICE and ORR's forcible and continued separation and isolation of young children from their parents was cruel and unusual. It was also unlawful.

---

[6] U.N. HUMAN RIGHTS COUNCIL, *Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment* ¶ 20, U.N. Doc. A/HRC/37/50, (Feb. 26, 2018), https://www.ohchr.org/Documents/Issues/Torture/A_HRC_37_50_EN.pdf.

12. The United States is liable in damages for the conduct which harmed Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA"). The conduct against these noncitizens also violated the law of nations, conferring jurisdiction on the court under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, as individual agents acting for the United States: (1) inflicted severe physical or mental pain or suffering and did so in a coordinated effort to limit or forestall migration and asylum from Latin America, which meets the customary international law definition of torture; and (2) did so motivated by a discriminatory animus against individuals of Central American origin and other BIPOC, targeting parents and children for separation on national, ethnic or racial grounds, thereby constituting the crime against humanity of persecution as defined under customary international law.

13. Plaintiffs bring this action under the FTCA and ATS seeking compensation for the extraordinary harms they suffered at the hands of ICE and ORR officials.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331, 1346(b), and 1350.

15. On October 30, 2019, Plaintiffs Mr. B. and D.C.B. submitted an administrative claim to DHS, HHS, U.S. Customs and Border Protection (CBP),

7

U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and

Immigration Services (USCIS). No agency has made a final disposition on

Plaintiffs' administrative claims and, as more than six months have passed since

Plaintiffs' submission of the claims, they are deemed constructively denied. 28

U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all potential

administrative remedies.

16.    Venue is proper in this District under 28 U.S.C. §§ 1391 and 1402(b)

as Plaintiffs are residents of this District.

## PARTIES

17.    Plaintiff Mr. B.[7] is an adult asylum seeker from Brazil and is the

father of D.C.B. Together with D.C.B., Mr. B. fled Brazil seeking protection from

persecution, including threats to his life and that of his son. Now 35 years old, Mr.

B. was 28 years old at the time DHS and ORR officials forcibly took and kept his

son away from him.

18.    Plaintiff D.C.B. is a 13-year-old asylum seeker from Brazil and the

son of Mr. B. He was only six years old when DHS and ORR officials forcibly

separated him from his father. D.C.B. entered the United States with his father on

---

[7] Plaintiffs use their initials in order to protect the identity of minor child D.D.C.B., who proceeds under initials pursuant to Fed. R. Civ. P. 5.2. In addition, Mr. B further wishes to protect his identity because he fears consequences from those who threatened him in his home country. Plaintiffs intend to file a motion to proceed under initials pursuant to *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).

or about November 18, 2017, to seek protection from persecution. This action is brought on his behalf, under the authority of his father, Plaintiff Mr. B.

21.    Defendant United States of America is the appropriate defendant under the FTCA, 28 U.S.C. §§ 1346(b), 2671, *et seq*., and under the Alien Tort Statute, 28 U.S.C. § 1350, as the United States has no sovereign immunity for violations of *jus cogens* violations such as torture and the crime against humanity of persecution.

22.    All federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies including, but not limited to, DHS, its subsidiaries, ICE and CBP, and HHS and its subsidiary, ORR.[8]

23.    DHS agents were responsible for separating Mr. B from his child. DHS employees also are responsible for supervising and managing detained individuals at CBP and ICE facilities.

24.    HHS agents are responsible for supervising and managing the detention of children the government classifies as unaccompanied.

---

[8] The unlawful appointment of various Acting Secretaries of the Department of Homeland Security is not relevant to this Complaint, as the family separation policy was instituted by a prior Senate-confirmed Secretary of Homeland Security, Kirstjen Nielsen.

25.     At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers.[9]

## STATEMENT OF FACTS

### A. The Trump Administration's Family Separation Policy

#### 1. The Development of the Separation Policy and Its Intent to Deter Future Central American and BIPOC Asylum Seekers

26.     Trump Administration officials pursued a range of immigration policies that collectively aimed to dramatically decrease the number of individuals—primarily Central Americans, Africans, and other Black, indigenous, and people of color (BIPOC) immigrants — from seeking asylum in the United States.[10] One of the many tools used by the DHS to deter, bar or coerce parents from seeking asylum was the creation of a family separation policy.

---

[9] 28 U.S.C. § 2680(h).

[10] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-19-163, UNACCOMPANIED CHILDREN: AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE BORDER (Oct. 2018), *available at* https://www.gao.gov/assets/700/694963.pdf [hereinafter GAO REPORT]. *See also, e.g.*, Kevin Lemarque, *U.S. Judge Bars Trump Administration From Enforcing Asylum Ban*, CNBC (Nov. 20, 2018), https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU (Oct. 30, 2018), https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers; Nick Miroff & Josh Dawsey, *The Advisor Who Scripts Trump's Immigration Policy*, WASH. POST (Aug. 17, 2019), https://www.washingtonpost.com/graphics/2019/politics/stephen-miller-trump-immigration/; Emma Platoff, et al., *While Migrant Families Seek Shelter From Violence, Trump Administration Narrows Path to Asylum*, TEXAS TRIBUNE (July 10, 2018), https://www.texastribune.org/2018/07/10/migrant-families-separated-border-crisis-asylum-

27.     In an effort to deter and limit the number of individuals seeking asylum, in July of 2017, the Trump Administration established a family separation pilot program in CBP's El Paso sector, which covers regions in Western Texas and New Mexico.[11] This pilot program targeted parents who crossed the border with children for criminal prosecution.[12]

28.     Through this program, DHS and subsidiary agency officials detained parents and children, forcibly took children away from their parents' custody, and referred the parents to the Department of Justice (DOJ) for criminal prosecution.[13] Children, some as young as four months old,[14] were separated from their parents, designated as unaccompanied minors, and placed in the custody of ORR.[15] The vast majority of separated families, including Plaintiffs, were not informed by immigration officials when or how they would be reunited; nor were they assured

seekers-donald-trump/; Maria Sacchetti, et al., *Trump Tightens Asylum Rules, Will Make Immigrants Pay Fees to Seek Humanitarian Refuge*, WASH. Post (Apr. 30, 2019), https://www.washingtonpost.com/politics/trump-issues-memo-calling-for-changes-to-handling-of-asylum-cases/2019/04/29/df41b5f2-6adb-11e9-be3a-33217240a539_story.html; Glenn Thrush, *U.S. to Begin Blocking Asylum Seekers From Entering Over Mexican Border*, N.Y. TIMES (Jan. 24, 2019), https://www.nytimes.com/2019/01/24/us/politics/migrants-blocked-asylum-trump.html; Yeganeh Torbati & Kristina Cooke, *Trump Administration Moves to Curb Migrants' Asylum Claims*, REUTERS, Nov. 8, 2018, https://www.reuters.com/article/us-usa-immigration-asylum/trump-administration-moves-to-curb-migrants-asylum-claims-idUSKCN1ND35K.

[11] GAO REPORT, *supra* note 10, at 15-16. *See also* HHS OIG REPORT I, *supra* note 3, at 3.
[12] *Id.*
[13] HHS OIG REPORT I, *supra* note 3, at 4.
[14] Todd Heisler & Caitlin Dickerson, *The Youngest Child Separated From His Family at the Border Was 4 Months Old*, N.Y. TIMES (Jun. 18, 2019), https://www.nytimes.com/2019/06/16/us/baby-constantine-romania-migrants.html.
[15] HHS OIG REPORT I, *supra* note 3, at 4.

that they would not be deported without their children in the event their asylum claim failed.[16]

29.     During the span of only five months, from July to November 2017, the government separated at least 281 individuals in families through this pilot initiative.[17]

30.     In December 2017, one month after the end of the pilot program, the Trump Administration circulated a memorandum entitled "Policy Options to Respond to Border Surge of Illegal Immigration."[18] Two of the policies outlined in the memorandum were titled: "Increased Prosecution of Family Unit Parents" and "Separate Family Units."[19] This memorandum evinced the Administration's deterrent intent and was reviewed by senior officials at the Department of Justice and DHS.

---

[16] *See* Miriam Jordan, '*I Can't Go Without My Son,' A Mother Pleaded as She Was Deported to Guatemala,* N.Y. TIMES (June 17, 2018), https://www.nytimes.com/2018/06/17/us/immigration-deported-parents.html; Christianna Silva, *What we know about the immigrant kids separated from their* families, VICE NEWS (June 22, 2018), https://www.vice.com/en_us/article/evkwq4/what-we-know-about-the-immigrant-kids-separated-from-their-families.

[17] HHS OIG REPORT I, *supra* note 3, at 3.

[18] *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), *available at* https://www.documentcloud.org/documents/5688664-Merkleydocs2.html [hereinafter *Policy Options*]. *See also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC NEWS (Jan. 17, 2019), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targeting-migrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).

[19] *Policy Options*, *supra* note 18.

31.     Under the "Prosecution" policy, the memorandum states that "parents would be prosecuted for illegal entry . . . and the minors present with them would be placed in HHS custody as [unaccompanied noncitizen children]." Similarly, under the "Separate Family Units" policy, the memorandum called for an announcement that adults would be placed in adult immigration detention (primarily county jails and privately contracted detention centers), while children would be placed in ORR custody. The memorandum specifically asserted that the "increase in prosecutions would be reported by media and it would have substantial deterrent effect." Indeed, the Administration intended that publicity concerning the trauma suffered by asylum seekers would deter other would-be asylum seekers from seeking refuge in the United States for fear of suffering the same fate.

32.     Ultimately, this December 2017 memorandum, outlining the prosecution and separation policies. is consistent with directives announced, approximately five months later, on April 6, 2018, by then-Attorney General Jeff Sessions.

33.     On April 6, 2018, then-Attorney General Jeff Sessions announced the government's new "Zero Tolerance" policy, directed specifically and exclusively at the Southwest Border, which mandated the prosecution of all persons who

crossed the United States border between ports of entry.[20] This policy effectively

endorsed the practices of criminal prosecution and family separation previously

tested in the El Paso pilot program.

34.    The Trump Administration knew and intended that the zero-tolerance

policy would result in family separation. [21]

35.    The Trump Administration enacted these policies to deter individuals

from seeking asylum or otherwise coming to the United States by forcibly

separating parents from their children.[22] A statement released by the White House

entitled "What You Need To Know About President Donald J. Trump's Efforts To

End Catch And Release"[23] shows that ending "catch and release" was intended to

"empower Federal authorities . . . with the legal authority and resources [needed],"

---

[20] Memorandum from The Attorney General to Federal Prosecutors Along the Southwest Border (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[21] Nila Bala & Arthur Rizer, *Trump's family separation policy never really ended. This is why.*, NBC NEWS (Jul. 1, 2019), https://www.nbcnews.com/think/opinion/trump-s-family-separation-policy-never-really-ended-why-ncna1025376 ("[T]he zero tolerance and family separation policies are distinct from each other. Family separation refers to the policy of automatically breaking up family units because children cannot be detained in adult detention centers, while 'zero tolerance' is an approach to border crossings in which all undocumented immigrants who enter our country through the border with Mexico are automatically referred for criminal prosecution and sent to pretrial jail. Child separation, though, is a direct result of zero tolerance, and cannot be ended without truly ending zero tolerance.").

[22] *See 60 Minutes*, *Chaos on the Border, Robots to the Rescue, To Kill a Mockingbird*, CBS TELEVISION BROADCAST, Nov. 25, 2018 (revealing an un-redacted copy of the memo implementing the "Zero Tolerance" policy that stated that the policy's purpose was deterrence); *see also Policy Options*, *supra* note 18.

[23] "Catch and Release" is a simplified, misleading term referring to a federal practice implemented by various administrations allowing asylum-seekers, among other groups of immigrants, to live in the community, rather than be held in government custody, while awaiting their immigration hearings. This practice is fully in accord with U.S. immigration law.

to address the issue of "more than 107,000 [unaccompanied children being] released into the United States since fiscal year 2016."[24]

36.    Former Attorney General Sessions attacked asylum as "an easy ticket to illegal entry into the United States," swamped with "vague, insubstantial, and subjective claims."[25] Secretary Nielsen signed off on the policy after receiving a memo observing that such a policy would "have the greatest impact on current flows."[26] The National Security Council and Stephen Miller laid out their strategy to turn away and deny asylum seekers even when processed: In July 2019, a National Security Council official told CBP officials, "My mantra has persistently been presenting aliens with *multiple unsolvable dilemmas* to impact their calculus for choosing to make the arduous journey to begin with."[27]

---

[24] *What You Need To Know About President Donald J. Trump's Efforts To End Catch And Release*, The White House, Statements & Releases, April 9, 2018, https://trumpwhitehouse.archives.gov/briefings-statements/need-know-president-donald-j-trumps-efforts-end-catch-release/.
[25] Jeffrey B. Sessions III, *Remarks to the Executive Office for Immigration Review* (Oct. 12, 2017) (transcript available at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review).
[26] Cora Currier, *Prosecuting Parents–and Separating Families–Was Meant to Deter Migration, Signed Memo Confirms*, THE INTERCEPT (Sept. 25, 2018), https://theintercept.com/2018/09/25/family-separation-border-crossings-zero-tolerance/ (containing excerpts of the DHS memo). *See also* Memorandum to the Secretary of Dep't of Homeland Security, Kirstjen Nielson, from Kevin K. McAleen, *Increasing Prosecutions of Immigration Violations* (Apr. 23, 2018), https://www.documentcloud.org/documents/4936850-Part3-From-CBP-2018-070727-Redacted.html#document/p14/a456180.
[27] Julia Ainsley, *Stephen Miller Wants Border Patrol, Not Asylum Officers, to Determine Migrant Asylum Claims*, NBC NEWS (July 29, 2019), https://www.nbcnews.com/politics/immigration/stephen-miller-wants-use-border-agents-screen-migrants-cut-number-n1035831 (emphasis added). Jud Murdock, CBP's Acting Assistant Commissioner stated in December 2018 that actually considering asylum seekers' applications would only encourage more asylum seekers to come, emphasizing what the administration

37.    With full knowledge that the policy of forcibly separating children from their families would cause severe harm to those affected—and specifically intending to cause such harm—Administration officials at the highest levels created a legally sanctioned procedure to incite fear, and inflict trauma, and pain on lawfully asylum-seeking families.[28]

38.    Administration officials did this despite, and indeed in part because of, repeated warnings about the catastrophic, traumatic injuries forced and prolonged separation of families would produce. For example:

a.    In September 2016, more than a year before the family separation pilot program officially began in El Paso, the DHS Advisory Committee on Family Residential Centers issued a report concluding that "[t]he best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS."[29] This report explicitly warned that

---

wished to avoid: "[t]he more we process, the more will come." Hamed Aleaziz, *The Trump Administration is Slowing the Asylum Process to Discourage Applicants, An Official Told Congress*, BUZZFEED (Dec. 17, 2018), https://www.buzzfeednews.com/article/hamedaleaziz/the-trump-administration-is-slowing-the-asylum-process-to.

[28] *Policy Options*, *supra* note 18; *see also*, Philip Bump, *Here are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST (June 19, 2018), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent.

[29] U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REPORT OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS (2016) at 2, *available at* https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf [hereinafter ICE FAMILY DETENTION REPORT].

"separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children."

b.    Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's Program, testified before Congress that, as early as February 2017, he repeatedly cautioned Administration officials that a policy of separating children from their parents had "significant potential for traumatic psychological injury to the child."[30] Administration officials ignored Commander White's warnings for over a year and up through the day he left ORR on March 15, 2018, mere weeks before the policy was launched across the entire southern border, and continued to disregard his warnings thereafter.

c.    In March 2017, several DHS officials told the press that the department was considering a policy of separating mothers and children who cross the border illegally in order to deter families from migrating to the United States. The very next day, the American Academy of Pediatrics

---

[30] *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), *available at* https://youtu.be/OPPncPb50QE?t=73. *See also* Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE (July 31, 2018), https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html.

responded with a statement opposing DHS's proposed family separation

program, warning that:

> Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers. Proposals to separate children from their families as a tool of law enforcement to deter immigration are harsh and counterproductive. We urge policymakers to always be mindful that these are vulnerable, scared children."[31]

39.    The Trump Administration, including DHS officials, not only

disregarded warnings from several of their own Administration members, they also

ignored a plethora of scientific and medical evidence demonstrating that separating

children from their parents likely causes extraordinary trauma and long-lasting

effects on children's development. The Administration acted intentionally and/or

recklessly and unreasonably by implementing these policies, which have been

proven to cause permanent emotional and behavioral problems and brain damage

in children.

40.    In the weeks following implementation of the family separation

policy, in May 2018, widespread media coverage sparked public outrage and

condemnation across the nation. In response to the public outrage, Administration

---

[31] Press Release, Fernando Stein & Karen Remley, Am. Acad. Of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border,* (Mar. 4, 2017), available at, https://web.archive.org/web/20200301051118/https://www.aap.org/en-us/about-the-aap/aap-press-room/Pages/immigrantmotherschildrenseparation.aspx.

officials denied all claims that they implemented the "Zero Tolerance" policy to deter immigration.[32] Remarkably, the Administration also publicly denied the existence of any policy of family separation as they were brutally meting it out.[33]

41.    These statements, however, were contradicted by the admissions of numerous high-level officials, including Secretary Nielsen, Attorney General Sessions, and then-White House Chief of Staff John Kelly, all of whom made statements confirming that family separation was the express policy and that its intended purpose was to terrorize and deter parents from seeking asylum through the use of forced family separation. The admissions reached the highest levels.

42.    Despite widespread condemnation and a federal court injunction requiring the government to reunite separated families and stop further separations, President Trump continued to defend the policy as a deterrent to migration from Central America, such as when he tweeted, "[I]f you don't separate, FAR more people will come."[34]

---

[32] *See* Christina Wilkie, *White House Denies Separating Families Is "Policy," but Insists It Is Needed "to Protect Children*," CNBC (Jun. 18, 2018), https://www.cnbc.com/2018/06/18/white-house-denies-separating-families-is-policy.html ; *The Way Forward on Border Security: Hearing Before the H. Comm. on Homeland Sec.*, 116th Cong. 46-47, 48 (2019) (statement of Sec. Kristjen Nielsen, Dep. of Homeland Sec.).

[33] Wilkie, *supra* note 32.

[34] Donald Trump (@realdonaldtrump), TWITTER (Dec. 16, 2018, 11:25 AM), https://twitter.com/realDonaldTrump/status/1074339834351759363 (emphasis in original); *see also* Kimberly Kindy, Nick Miroff & Maria Sacchetti, *Trump Says Ending Family Separation Practice Was a "Disaster" That Led to Surge in Border Crossings*, WASH. POST, Apr. 28, 2019, https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html.

43.     Accordingly, from 2017 through the time period at issue in this Complaint, government officials intentionally caused parents and children pain and suffering in order to deter them from seeking asylum, which is a universal human right dating to the 1951 United Nations Refugee Convention enacted to prevent a repeat of the horrors visited upon refugees who could not find sanctuary from persecution and slaughter during World War II.

### 2. The Implementation of the Separation Policy and the Failure and Refusal to Reunify

44.     During this period, CBP officers separated parents and children, including Plaintiffs, under the family separation policy at several immigration detention sites near the U.S.-Mexico border.

45.     Immigration officials frequently detained arriving parents and children, including Plaintiffs, in inhumane conditions. Immigration officials used cells which are commonly and infamously known as *hieleras* or "iceboxes" due to the cold temperature inside, in short-term detention centers to house parents and children.

46.     Shortly after arrival, immigration officials would inform parents, including Mr. B, that immigration officials would take their children. Having received limited information and not knowing when immigration officials would come for their children, the parents waited in terror.

47.     Often, parents' terror and anxiety compounded as they were effectively forced to watch immigration officials take other parents' children away.

48.     If the parents did not willingly hand their children over to immigration officials, or when children clung to their parents, the officials often forcibly ripped the children out of their parents' arms.

49.     Immigration officials separated children as young as four months old and as old as 17 years old from their parents, without regard for the children's, health, age or language ability.

50.     After forcibly separating family units, CBP transferred many parents, including Mr. B, into ICE custody.[35] Parents, including Mr. B, begged immigration officials not to take their children, but immigration officials did so, often with callous disregard for the parents' and children's all too evident distress.

51.     Parents often endured immigration officials physically seizing their terrified children from their side and forcibly carrying them out of the cells and out of their sight.

52.     Immigration officials flew children, including Plaintiff D.C.B., thousands of miles away from their parents under the pretense that the separation

---

[35] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HOMELAND SEC., OIG-18-84, SPECIAL REVIEW - INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE ZERO TOLERANCE POLICY (Sept. 27, 2018) at 2-3, 13, 15, *available at* https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf [hereinafter DHS OIG REPORT].

was the necessary result of the criminal prosecution of the parents. In an effort to create maximum chaos and harm, the government took the children regardless of whether their parents were taken into criminal custody, remained in criminal custody for any length of time, or were even prosecuted at all.

53.     Following family separation, the government then classified the children as "unaccompanied," even though they were accompanied by their parents when they arrived in the United States and remained accompanied until the government forcibly and unlawfully separated them from their parents and transferred the children to ORR custody. ORR is responsible for the long-term custodial care and placement of "unaccompanied [noncitizen] children." *See* 6 U.S.C. § 279(a).

54.     As predicted by then-White House Chief of Staff John Kelly, ORR staff then placed the children in "foster care or whatever."[36] The "whatever" included placement of many children in ORR facilities throughout the United States. At times, these facilities range from for- profit and non-profit warehouses with cages and prison-like beds, to temporary tent cities in the Texas desert, to

---

[36] *Transcript: White House Chief of Staff John Kelly's Interview with NPR* (May 11, 2018) (transcript available at https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr).

repurposed Wal-Marts, to foster care services run by religious organizations, to "tender-age" centers for babies and toddlers.[37]

55.     Various news agencies described these facilities as "unspeakable environments, characterized by a complete loss of human dignity."[38] For instance, many "facilities lacked basic hygiene products like toothbrushes and soap in many cases, and are often covered in lice."[39] In a Texas facility, visiting lawyers reported seeing "kids taking care of kids."[40] On one occasion, girls as young as 10 were trying to take care of "[a] 2-year-old boy [who] want[ed] to be held all the time."[41] Lawyers reported that there were some children who had wet their pants, but had no diapers and were wearing soiled clothing unable to bathe or change for weeks.

56.     The parents and children were not provided information as to each other's whereabouts or dates when they would be able to see or speak to each other again. Many parents, including Mr. B, had to wait weeks before speaking to their

---

[37] Silva, *supra* note 16.

[38] Nila & Rizer, *supra* note 21.

[39] *Id.*; *see also* Clara Long and Nicole Austin-Hillery, *We went to a border detention center for children. What we saw was awful*, CNN OPINION (Jun. 25, 2019), https://www.cnn.com/2019/06/24/opinions/children-migrant-centers-at-border-long-austin-hillery/index.html; Gaby Del Valle, *Lice, and Open Toilets: What Attorneys Saw at Migrant Processing Centers*, VICE NEWS (Jun. 22, 2019), https://www.vice.com/en_us/article/43jpjp/flu-lice-and-open-toilets-what-attorneys-saw-at-migrant-child-processing-centers.

[40] *Hundreds of migrant children held in unsafe conditions at Texas facility, lawyers warn*, GUARDIAN (Jun. 21 2019), https://www.theguardian.com/us-news/2019/jun/21/child-migrant-facilities-shocking-conditions-revealed .

[41] Cedar Attanasio, Garance Burke & Martha Mendoza, *Attorneys: Texas Border Facility Is Neglecting Migrant Kids*, ASSOCIATED PRESS (Jun. 21, 2019), https://apnews.com/46da2dbe04f54adbb875cfbc06bbc615.

children. In some cases, when parents finally obtained contact information for their

children, they were told they had to pay to make phone calls, a significant obstacle

for detained parents who had no resources.

57.    Parents including Mr. B, already traumatized by the threat of harm or

death that motivated their flight to the U.S., which was compounded by an

exhausting and perilous journey, thereafter suffered physically, mentally, and/or

emotionally during the separation from their children.

58.    Likewise, children separated from their parents, including D.C.B.,

suffered physically, mentally, and/or emotionally. Their trauma was aggravated by

the fact that, often times, many of them did not understand or were too young to

understand why they had been separated.[42] Some believed their parents had

abandoned them. Others could no longer even remember their parents,

compounding the stress, confusion, and trauma upon reunification.

59.    The government further exacerbated the children's and parents'

trauma by failing to take even the simplest and most reasonable steps to record

which children belonged to which parents, further demonstrating the

---

[42] OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09-18- 00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY 10 (Sept. 18, 2019), *available at* https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf) [hereinafter "HHS OIG REPORT II"] ("Children who did not understand why they were separated from their parents suffered elevated levels of mental distress. For example, program directors and mental health clinicians reported that children who believed their parents had abandoned them were angry and confused.").

Administration's sheer and utter disregard for the well-being of the families or their duty of care to human beings in its custody.

60.    The government's failure to ensure appropriate record-keeping manifested itself in many ways. For example, ICE's computer system "did not display data from CBP's systems that would have indicated whether a detainee had been separated from a child."[43] As a result, when ICE processed detained parents for removal, "no additional effort [was made] to identify and reunite families prior to removal."

61.    In 2018, immigration agencies identified 471 parents "who were removed from the United States without their children, and without being given the opportunity to elect or waive reunification in accordance with a court order. [June 26, 2018 preliminary injunction granted in favor of the *Ms. L* class.]."[44]

62.    The government's failures prolonged delays in parents' ability to locate and communicate with their children, and ultimately to be reunited, causing even more distress for separated families. These failures "also contributed to children's anxiety and fear for their parents' well-being."[45]

---

[43] DHS OIG REPORT, *supra* note 35, at 9-10.

[44] Order Granting In Part And Denying In Part Plaintiffs' Motion To Allow Parents Deported Without Their Children To Travel To The United States at *2, *Ms. L. v. U.S. Immigration and Customs Enforcement et al*., No. 18cv00428 DMS (MDD) (S.D. Cal. July 27, 2018), ECF No. 456 (*citing* ECF No. 382 at 7) ("But during the chaotic and unprecedented practice of separating these migrant families, 471 of the parents were deported without their children.").

[45] HHS OIG REPORT II, *supra* note 42, at 10-11.

63.     When the DHS Office of Inspector General ("OIG") pressed ICE for information that should have been available to ICE (e.g., information on the current location of separated children), ICE could not provide the information, and had to request it from HHS. DHS later "acknowledged to the OIG that there is no 'direct electronic interface' between the DHS and HHS tracking systems."[46] It became frighteningly clear that the U.S. Government had no plan, process or intention to systematically reunite children separated from their parents during family separation.

64.     As emphasized by United States District Court Judge Dana M. Sabraw of the Southern District of California in a ruling addressing the constitutionality of the family separation policy in *Ms. L. v. U.S. Immigration and Customs Enforcement*, the agencies' failure to coordinate tracking of separated families was a "startling reality" given that:

> The government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked and produced upon a detainee's release, at all levels—state and federal, citizen and [noncitizen]. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce [noncitizen] children. The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*. Certainly, that cannot satisfy the requirements of due process.[47]

---

[46] DHS OIG REPORT, *supra* note 35, at 11.
[47] *Ms. L.*, 310 F. Supp. 3d at 1144 (emphasis in original).

65.    The government compounded the harm it caused by failing to provide parents and children, including Plaintiffs, with any information regarding each other's whereabouts or well-being for weeks and, in many cases, months, and by failing to facilitate adequate communication between parents and children.[48] The torture of not knowing where their family members were, whether they were healthy and safe, and when or whether they would see each other again further exacerbated the trauma parents and children suffered as a result of being torn apart.[49]

66.    Although President Trump signed an executive order ("EO") purporting to end the policy of family separation on June 20, 2018 after provoking

---

[48] *See, e.g.*, *id.* at 1136-37 ("[T]here is no genuine dispute that the Government was not prepared to accommodate the mass influx of separated children. Measures were not in place to provide for communication between governmental agencies responsible for detaining parents and those responsible for housing children, or to provide for ready communication between separated parents and children."); Kevin Sieff, *The Chaotic Effort to Reunite Immigrant Parents with Their Separated Kids*, WASH. POST (June 21, 2018), https://www.washingtonpost.com/world/the_americas/the-chaotic-effort-to-reunite-immigrant-parents-with-their-separated-kids/2018/06/21/325cceb2-7563-11e8-bda1-18e53a448a14_story.html  (reporting that "government authorities have often been unwilling to arrange phone calls between [separated parents and children], or provide details about where the child is held").

[49] *See, e.g.*, HHS OIG REPORT II, *supra* note 42, at 11 ("Adding to the challenge of addressing mental health needs of separated children was the uncertainty that came with a hectic reunification process for children covered by the *Ms. L v. ICE* lawsuit. Changing guidance resulted in uncertainty around how or when reunification would happen. For example, case managers in facilities were not always able to let children know when, or even if, they would be reunified with their parents, or whether that reunification would happen in the United States. This type of uncertainty added to the distress and mental health needs of separated children. [F]acilities reported that logistical issues introduced further uncertainty that could lead to emotional distress. Facilities reported that some reunifications were scheduled with little advance notice, or suddenly canceled or delayed, which increased the levels of uncertainty and anxiety in separated children.").

widespread national and international condemnation, families continued to be torn apart.[50]

67.    The EO stated that it is the "policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources."

68.    The EO, however, did not explain whether or how the federal government would reunify children whom the government had forcibly separated from their parents. In fact, on June 22, 2018, the government admitted that it had no reunification procedure in place.[51]

69.    On June 26, 2018, in *Ms. L.*, Judge Sabraw ordered the government to reunify families. The class-wide preliminary injunction, among other things, prohibited the government from separating parents from their minor children in the

---

[50] *Affording Congress an Opportunity to Address Family Separation*, Exec. Order No. 13841, 83 Fed. Reg. 29435 (June 25, 2018).

[51] *See Ms. L.*, 310 F. Supp. 3d at 1140–41 (citing Transcript of Status Conference at *29-30, *Ms. L.*, No. 18cv00428 DMS (MDD) (S.D. Cal. June 22, 2018), ECF No. 77); *see also,* GAO REPORT, *supra* note 10, at 21 ("HHS officials told [the GAO] that there were no specific procedures to reunite children with parents from whom they were separated at the border prior to the June 2018 court order."). The only procedure in place capable of reuniting children with their parents was the procedure developed to place unaccompanied children with sponsors in compliance with the Trafficking Victims Protection Reauthorization Act. *Id.* Under this procedure, however, a parent could only be reunited with his or her child if the government deemed them eligible to be a sponsor. *Id.* Judge Sabraw noted that this procedure was inadequate because it was created to address "a different situation, namely what to do with [noncitizen] children who were apprehended *without their parents* at the border or otherwise," and further, that the procedure was not developed to address situations such as this one where family units were separated by government officials after they crossed the border together. *Id.* at 27 (quoting Order Following Status Conference at *2, *Ms. L.*, No. 18cv00428 DMS (MDD) (S.D. Cal. July 10, 2018), ECF No. 101).

future, absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within fourteen days, and with children aged five and older within thirty days.[52]

70.    Only after Judge Sabraw issued the injunction did the government begin taking steps to reunify families who were members of the *Ms. L.* class. These efforts were marred by chaos and hampered by the Administration's animus toward asylum-seeking families.

71.    The government claimed that DHS and HHS had created a centralized database containing all relevant information regarding parents separated from their children. But there was "no evidence that such a database exists."[53] Any data the government collected was incomplete, contradictory, and unreliable.

72.    Accordingly, the agencies resorted to a variety of inefficient and ineffective methods to determine which children were subject to Judge Sabraw's injunction,[54] including hand-sifting through agency data looking for any indication that a child in HHS custody had been separated from his or her parent, and calling in the officer of the Assistant Secretary for Preparedness and Response, an HHS

---

[52] *Ms. L.*, 310 F. Supp. 3d at 1149-50.
[53] DHS OIG REPORT, *supra* note 35, at 10.
[54] GAO REPORT, *supra* note 10, at 23-25.

agency whose normal prerogative involves responding to hurricanes and other public health disasters, to review data provided by HHS, DHS, and ORR.

73.    The method for determining which families required reunification changed frequently, sometimes more than once a day, with staff at one ORR shelter reporting that "there were times when [they] would be following one process in the morning but a different one in the afternoon."[55]

74.    Judge Sabraw criticized the agencies for their callous treatment of families: "[W]hat was lost in the process was the family. The parents didn't know where the children were, and the children didn't know where the parents were. And the government didn't know, either."[56]

75.    Consistent with Judge Sabraw's rulings, the government's policy of separating children from their parents absent a determination that the parents were unfit or presented a danger to their children and its failure to track the children and promptly reunite the families once they were separated violated the constitutional right to family integrity of the persons subject to the policy.[57]

---

[55] *Id*. at 27.

[56] Transcript of Status Conference at *58, *Ms. L.*, No. 18cv0428 DMS (MDD) (S.D. Cal. July 27, 2018), ECF No. 164.

[57] *See W.S.R. v. Sessions,* 318 F. Supp. 3d at 1125 (finding separation of two father-son pairs shortly after crossing the U.S.-Mexico border constituted a violation of "the fundamental right to reunify with a fit parent in immigration custody"); *see also Ms. L. v. U.S. Immigration and Customs Enf't*, 302 F. Supp. 3d 1149, 1161-67 (S.D. Cal. 2018) (finding that plaintiffs had stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children,

76.    As evidenced by Administration officials' statements that the policy's purpose was to deter asylum seekers, the government's refusal to provide parents and children any information about each other's whereabouts and well-being, and its failure to track separated families and address reunification in any meaningful way until a federal judge ordered it to do so, Defendant intentionally instituted and implemented this policy for the purpose of inflicting emotional, physical and mental distress on the parents and children whom it separated.

77.    The U.S. government succeeded in its goal to punish asylum-seeking families. It succeeded, with devastating consequences for Plaintiffs.

**B. The Well Known Physical and Mental Health Trauma Associated Resulting from Family Separation**

78.    Separating a young child from a parent – particularly when the child has no information about the parent's whereabouts or the possibility of reunification – is a traumatic event in the child's life. "Decades of research have concluded that children," like the minor Plaintiffs, who have been forcibly and "traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma."[58]

---

while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *Ms. L.*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the merits of their substantive due process claim); *see also Smith v. Org. of Foster Families for Equal. & Reform,* 431 U.S. 816, 845 (1977) (liberty interest in family relationships has its source in "intrinsic human rights").
[58] Miriam Jordan, *A Migrant Boy Rejoins His Mother, But He's Not the Same*, N.Y. Times (July 31, 2018), https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html.

79.     Recent studies indicate that "separation can impair memory and normal production of cortisol, a hormone produced in response to stress."[59] The American Academy of Pediatrics has explained the real life harm suffered when a child is ripped away from his parent: "[f]ear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsible relationship . . . can harm the developing brain and harm short-and long-term health."[60]

80.     [H]ighly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short-and long-term health. This type of prolonged exposure to serious stress – known as toxic stress – can carry lifelong consequences for children."[61]

81.     The trauma caused by the government's inhumane actions will have a devastating and lasting impact on the Plaintiffs' physical and mental well-being, their familial relationship, and their mental health, likely for the rest of their lives.

---

[59] *Id.*
[60] Letter from Colleen A. Kraft, MD, FAAP, President of the American Academy of Pediatrics, to DHS Secretary Nielsen (Mar. 1, 2018), https://downloads.aap.org/DOFA/AAP%20Letter%20to%20DHS%20Secretary%2003-01-18.pdf.
[61] Colleen A. Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border, Am. Acad. of Pediatrics* (May 5, 2018), https://docs.house.gov/meetings/IF/IF14/20180719/108572/HHRG-115-IF14-20180719-SD004.pdf.

## C. The Four-Week Forced Separation of Mr. B. and D.C.B.

### 1. Mr. B. and his son fled Brazil to seek asylum in the United States.

82.     In Brazil, Mr. B. and his son D.C.B. faced persecution. Mr. B. worked for a large company and had multiple clients who were employed as police officers. One of these clients murdered a man who was renting a room in Mr. B.'s mother-in-law's home over a drug-related dispute. The police officer told Mr. B. that if he spoke to anybody about the murder, he or his associates would kill Mr. B. and his family. Mr. B. fears for his and his family's safety as a result of this threat and cannot seek protection from local law enforcement owing to the corruption of police officers involved in criminal organization networks.

83.     Fleeing the above persecution, on October 21, 2017, Mr. B. and D.C.B. left Brazil.

84.     Mr. B.'s wife, and D.C.B.'s mother presented herself at the U.S.-Mexico border approximately one month before Mr. B. and D.C.B. did. She was detained for approximately 27 days in a Texas facility. After her release, Mr. B. and D.C.B. attempted to enter the United States.

85.     On or about November 19, 2017, Mr. B. and D.C.B. presented themselves at the U.S.-Mexico border and were detained.

**2. After Mr. B. and D.C.B. crossed the U.S.-Mexico border to seek asylum, immigration officials apprehended, detained, and forcibly separated the family.**

86.    Mr. B. and D.C.B. were detained for three days near the border**.** The conditions of the place where they were detained were very poor. The children slept on the floor with their fathers. It was very cold, there was no privacy, and the lights were on all the time. Hygiene was poor as detainees were denied the opportunity to shower and bathe themselves. The guards only spoke Spanish, and Mr. B. and D.C.B. speak only Portuguese.  The Brazilians frequently did not understand the guards' attempts at communication and therefore communication between Plaintiffs and guards was extremely limited.

87.    On or about November 22, 2017, a guard told Mr. B. and D.C.B. that they would be taken to separate rooms. They were not taken to separate rooms: both Mr. B. and his son were placed in handcuffs and taken to separate facilities. Mr. B. was taken to South Texas Detention Facility and D.C.B. was taken to a shelter thousands of miles away. The guards did not tell Mr. B. where they would be taking him, nor did they tell Mr. B. where they would be taking his six-year-old son.

88.    D.C.B. was clinging to his father and was distraught when the guard physically separated them.

### 3.  Following the separation from his father, D.C.B. was forcibly sent to ORR custody in Chicago away from his father.

89.    The Government placed D.C.B. at an ORR facility in Chicago, Illinois, operated by Heartland Human Care Services ("Heartland"). Mr. B. was not told where his son had been taken, and he was not permitted to speak with D.C.B. for over two weeks.

90.    The Department of Children and Family Services has repeatedly cited Heartland for not providing appropriate supervision to minors under its custody, including one instance of 27-year-old adult staff member having an inappropriate sexual relationship with a 17-year-old boy in her care. The consequences of the lack of supervision resulted in minors engaging in inappropriate sexual activity with each other and a number of children running away from Heartland facilities, with Heartland declining to report whether the children were ever located and returned to their custody.[62]

91.    In this facility, six-year-old D.C.B. was forced to clean bedrooms and bathrooms.

92.    It is not known why the Government chose to send D.C.B. to a facility several states and thousands of miles away, at cost to taxpayers, while D.C.B.'s

---

[62] Duaa Eldeib, Jodi S. Cohen and Melissa Sanchez, *Records Reveal "Lax" Supervision, Sexual Activity at Chicago-Area Shelters Housing Immigrant Children*, PROPUBLICA (Aug. 2, 2018) https://www.propublica.org/article/heartland-chicago-immigration-shelters-lax-supervision-sexual-activity

mother was not detained and was present, willing and able to care for her 6-year-old son.

93.    D.C.B. experienced, and continues to experience, severe psychological trauma and emotional distress from the separation.

94.    D.C.B. was separated from his mother for 29 days. D.C.B. was separated from his father for an additional 31 days after his reunification with his mother, for a total of 60 days' separation from Mr. B.

### 4. After being separated from his son, Mr. B. remained in federal custody.

95.    After being separated from his son, Mr. B. was detained in federal custody in Texas. He was there for approximately 60 days.

96.    Mr. B. was not able to speak to his six-year-old son for the first 15 days of his detention. Although Mr. B. requested information about his son, days and weeks passed with no information or ability to contact him.

97.    The Government did not provide D.C.B.'s mother with information on D.C.B.'s whereabouts and condition. Therefore, D.C.B.'s status was wholly unknown to all members of his family for over two weeks.

98.    After 15 days, Mr. B. was allowed one phone call with D.C.B. Mr. B. was only allowed to speak with him one further time, for a total of two phone conversations, over the course of his 60-day detention.

99.    When Mr. B. was allowed to speak with D.C.B., the 6-year-old boy cried and expressed how much he missed his parents.

100.    Because of the separation from his 6-year-old son, Mr. B. was caused significant mental anguish during his detention. Mr. B. "didn't sleep, didn't eat, I didn't know where I was, all I did was cry. They never gave me answers."

### 5. Mr. B. and  D.C.B.'s reunification.

101.    On or around December 23, 2017, with the assistance of the Brazilian consulate in Rio de Janeiro,  D.C.B. was released into the custody of his mother. He had been detained for 29 days.

102.    Mr. B. was released from custody on or around January 23, 2018. He had gone approximately 60 days without seeing his son.

### 6.  Mr. B. and D.C.B.'s Harms and Losses

103.    Both Mr. B. and D.C.B. suffered stress, depression, and anxiety during and after their separation.

104.    Because of the emotional stress brought on by being separated from his son, Mr. B. was unable to sleep more than one to two hours per night while detained in Texas.

105.    To this day, Mr. B. reports that he can never sleep well again.

106.    D.C.B. now suffers from behavioral problems as a result of the separation, and still lives in fear that he will be separated from his parents again.

## COUNT I

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

108.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

109.    By engaging in the acts described in this Complaint, the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress. Namely, Mr. B's forced separation from his child was directed as part of a broader policy designed to inflict maximal punishment, stress and trauma on asylum seekers so as to deter future migrants from seeking asylum in the United States. In addition, U.S. officials specifically refused to alleviate the families' known and obvious emotional distress by making inconsistent and pretextual excuses to prevent reunification.

110.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

111.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for intentional infliction of emotional distress.

112.    The conduct of federal officers and officials was outrageous and harmful, and Plaintiffs are entitled to punitive damages.

## COUNT II
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

113.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

114.   The federal officers and officials referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs. The risks of harm from the government's conduct was known to federal officers and officials or should have been known.

115.   By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

116.   As a direct and proximate result of the referenced conduct, Plaintiffs suffered severe emotional distress.

117.   Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for negligence.

## COUNT III
## NEGLIGENCE

118.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

119.   The federal officers referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

120.    By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

121.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages. Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for its negligence.

## COUNT IV
## LOSS OF CONSORTIUM

122.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

123.    Plaintiffs have suffered severe, permanent, and disabling injuries. They now must contend with the long-term health effects and emotional and psychological trauma caused by the federal officers referenced above.

124.    The wrongful conduct of the federal officers referenced above directly and proximately caused these injuries, which substantially interfere with Plaintiffs' capacity to interact with one another in a normally gratifying way and has caused Plaintiffs to suffer damages as a result.

125.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for damages for loss of consortium.

## COUNT V

## TORTURE

126.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

127.    The acts committed by U.S. officers and officials against Plaintiffs constitute torture, which the court has jurisdiction to remediate via damages under the Alien Tort Statute, 28 U.S.C. §1350.

128.    "[T]orture means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." 18 U.S.C. § 2340(1). This includes "act[s] specifically intended to inflict severe physical or mental pain or suffering . . . for the purpose of . . . punishment, intimidation, coercion, or any reason based on discrimination of any kind." 18 U.S.C. § 2441(d)(1)(A) (War Crimes Act). "[S]evere mental pain or suffering" means "prolonged mental harm caused by or resulting from," among other things, "the intentional infliction or threatened infliction of severe physical pain or suffering," or "threatened" harm to the victims or third persons. 18 U.S.C. § 2340(2) (definitions applicable to 18 U.S.C. § 2340A

(Anti-Torture Statute)); 18 U.S.C. § 2441(d)(2)(D) (incorporating definition from

18 U.S.C. § 2340(2)).[63]

129.    The norm prohibiting torture is well settled under U.S. and

international law, including customary international law, and has reached *jus

cogens* status. The norm presents a non-derogable duty that no sovereign can

avoid.

130.    Federal officials intentionally inflicted severe physical or mental pain

or suffering on Plaintiffs, and did so in order to coerce and intimidate them to

forfeit their legal rights.

## COUNT VI
## CRIME AGAINST HUMANITY: PERSECUTION

131.    All preceding paragraphs are hereby incorporated by reference as if

fully set forth herein.

132.    The acts committed by U.S. officials against Plaintiffs constitute

under customary international law, the crime against humanity of persecution,

which the court has jurisdiction to remediate via damages under the Alien Tort

Statute, 28 U.S.C.§1350. Crimes against humanity are universally proscribed and

clearly defined under international law. Crimes against humanity are the

---

[63] *See also* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
Punishment art. 1, ¶ 1, GA Res. 39/46, (Dec. 10 1984) (CAT), reprinted in 23 ILM 1027 (1984),
as modified, 24 ILM 535 (1985) (defining torture as including causing "severe pain or suffering,
whether physical or mental," without the requirement to show prolonged mental harm).

commission of certain prohibited acts as part of a widespread or systematic attack against a civilian population. "Attack" means a course of conduct involving the commission of acts against a civilian population, pursuant to or in furtherance of a State or organizational policy; it does not equate to a military attack nor require the existence of an armed conflict.

133.   Persecution, as a crime against humanity, is universally proscribed and clearly defined as the intentional and severe deprivation of fundamental rights contrary to international law, based on the identity of the group, including on the basis of national, ethnic or racial grounds.[64]

134.   The crime against humanity of persecution, first codified in the Charter of the International Military Tribunal established at Nuremberg, has attained *jus cogens* status.

135.   The forcible separation of Plaintiffs, the withholding of information about the status of D.C.B. from Mr. B, the emotional distress inflicted on Plaintiffs by making inconsistent and pretextual excuses to prevent reunification, and the profound mental harm caused by the separation of parents from children on the basis of national, ethnic or racial status constitutes persecution.

---

[64] *See, e.g.,* Rome Statute of the International Criminal Court art. 7(1)(h), 7(2)(g), July 17, 1998, 2187 U.N.T.S. 90.

136.   The federal officials' acts and omissions were knowing, deliberate, and/or purposeful.

137.   The federal officials' acts and omissions were part of a widespread or systematic attack against migrants and asylum seekers at the Southwest border, the vast majority of whom came from Central America. This attack, and broader animus towards those nationalities, were knowingly effectuated through the Family Separation Policy.

137.   Through their acts and omissions, federal officials caused Plaintiffs to suffer the severe deprivation of their fundamental rights to family unity; to be free from torture and cruel, inhuman and degrading treatment; their right to a life with dignity; and to equality and non-discrimination in pursuing their right to asylum.

## COUNT VII
## CRIME AGAINST HUMANITY: INHUMANE ACTS

138.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

139.   The acts committed by U.S. officials against Plaintiffs also constitute, under international law inhumane acts, a category of crimes against humanity, which the court has jurisdiction to remediate via damages under the Alien Tort Statute, 28 U.S.C. §1350. Crimes against humanity are universally proscribed and clearly defined under international law. Crimes against humanity are the

44

commission of certain prohibited acts as part of a widespread or systematic attack against a civilian population. "Attack" means a course of conduct involving the commission of acts against a civilian population, pursuant to or in furtherance of a State or organizational policy; it does not equate to a military attack nor require the existence of an armed conflict.

140.    Inhumane acts, as a category of crimes against humanity, are acts that cause "great suffering, or serious injury to body or to mental or physical health."[65] Inhumane acts are similar in nature and gravity to other crimes against humanity such as torture, persecution, enforced disappearance, deportation or forcible transfer of a population, rape and other forms of sexual and gender-based violence, imprisonment in violation of fundamental rules of international law, murder, enslavement, and extermination.

141.    The crime against humanity of inhumane acts was first codified in the Charter of the International Military Tribunal established at Nuremberg, and has attained *jus cogens* status.

142.    The forcible separation of Plaintiffs, the withholding of information about the status of D.C.B. from Mr. B, the emotional distress inflicted on Plaintiffs by making inconsistent and pretextual excuses to prevent reunification, and the

---

[65] *See, e.g.*, Rome Statute of the International Criminal Court, A/CONF. 183/9 (July 17, 1998), art. 7(1)(k) and 7(2)(g).

profound mental harm caused by the separation of parents from children on the basis of national, ethnic or racial status constitute inhumane acts.

143.   The federal officials' acts and omissions were knowing, deliberate, and/or purposeful.

144.   The federal officials' acts and omissions were part of a widespread or systematic attack against migrants and asylum seekers at the Southwest border, the vast majority of whom were Central American or other BIPOC, effectuated through the "Zero Tolerance Policy," and broader animus towards those nationalities, and were committed with knowledge of that attack.

145.   Through their acts and omissions, federal officials have intentionally caused Plaintiffs great suffering, and serious injury to body and to their mental and physical health.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the following relief:

A. Compensatory and punitive damages;

B. Attorneys' fees and costs pursuant to, among other provisions, 28 U.S.C. § 2412 and 28 U.S.C. § 2678; and

C. Such other and further relief as the Court deems just and appropriate.

Dated: April 15, 2025                    */s/ Karen L. Hoffmann*
                                         Karen L. Hoffmann
                                         PA ID No. 323622

ELLENBERG LAW GROUP
1500 JFK Blvd., Suite 1825
Philadelphia, PA 19102
(215) 790-1682
karen@sellenberglaw.com