IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| D.C.B., et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | No. 25–1924 |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS**

Plaintiffs D.C.B. and "Mr. B."[1] assert claims under the Federal Tort Claims Act (FTCA) and the Alien Tort Statute (ATS) for (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress, (3) negligence, (4) loss of consortium, (5) torture, (6) crime against humanity: persecution, and (7) crime against humanity: inhumane acts, *see* Compl. (ECF 1) ¶¶ 119–145, which they attribute to a "policy designed to inflict maximal punishment, stress and trauma on asylum seekers so as to deter future migrants from seeking asylum in the United States," *id.* ¶ 109.

Nonetheless, their Complaint relies on alleged executive "policies" applicable at other times, or in other places—and that **did not apply to these Plaintiffs**—and on alleged harm to other migrants. Therefore, the Court must consider only the Plaintiffs' own sparsely alleged facts and the law that would apply to the Plaintiffs' own claims.

Under a proper analysis of this case, Plaintiffs' Complaint must be dismissed because (1) the FTCA and ATS do not waive sovereign immunity to permit Plaintiffs' own claims here, and (2) the Complaint does not otherwise state any cognizable claim.

I.    RELEVANT LEGAL BACKGROUND

A.    **Legal framework for aliens arriving at the United States border**

Under the Immigration and Nationality Act (INA), an alien who arrives at the border, including at a port of entry, is an "applicant for admission" and must submit to

---

[1] Plaintiffs have filed this matter pseudonymously, and in accord with the procedural rules regarding minors, this brief uses the same identifiers used in the Complaint.

inspection by immigration officers. 8 U.S.C. §§ 1225(a)(1), (3). If an immigration officer determines the alien lacks proper documentation, and is thus inadmissible under 8 U.S.C. § 1182(a)(7), the alien is subject to expedited removal, and the immigration officer must order the alien removed "without further hearing or review," unless the alien declares an intent to apply for asylum or a fear of persecution. *Id.* § 1225(b)(1).

"Whether an applicant who raises an asylum claim receives full or only expedited review, the applicant is not entitled to immediate release." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 111 (2020). Rather, the applicant "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Id.* § 1225(b)(1)(B)(iii)(IV); *see also Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018). Detention is also authorized by 8 U.S.C. § 1226(a), under which "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States," and the government also has statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).

The government may, in its "discretion," temporarily grant parole and release individuals under certain circumstances, on a "case-by-case basis." 8 U.S.C. § 1182(d)(5); 8 C.F.R. §§ 235.3(b)(2)(iii), 235.3(b)(4)(ii). But federal courts lack jurisdiction "to review the … exercise of discretion in decisions to grant or deny parole." *Ashish v. Att'y Gen.*, 490 F.App'x 486, 487 (3d Cir. 2013); *see* 8 U.S.C. § 1252(a)(2)(B)(ii).

### B.    Legal framework for the immigration custody and release of minors

Federal law authorizes the government to provide for the custody and care of minor children entering the United States without authorization. *See* 6 U.S.C. § 279; 8 U.S.C. § 1232. The Office of Refugee Resettlement (ORR) in the U.S. Department of Health and Human Services is charged with the care and placement of unaccompanied alien children in custody due to their immigration status. *See* 6 U.S.C. §§ 279(a), 279(b)(1)(A), 279(b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1). And an unaccompanied alien

2

child (UAC) is one who: (1) has no lawful immigration status in the United States; (2) is not yet 18 years old; and (3) has no parent or legal guardian in the United States who is available to provide care and physical custody. 6 U.S.C. § 279(g)(2).

Additionally, the Trafficking Victims Protection Reauthorization Act (TVPRA) requires that unless "exceptional circumstances" apply, the government must transfer custody of any UAC to ORR within 72 hours of determining that the child is a UAC. *See* 8 U.S.C. § 1232(b)(3); *id.* § 1232(a)(3). ORR must "promptly" place UACs "in the least restrictive setting that is in the best interest of the child," *id.* § 1232(c)(2)(A), but it "shall not release such children upon their own recognizance." 6 U.S.C. § 279(2)(B).

Finally, in 1997, the government stipulated to the "Flores Agreement," which "sets out nationwide policy for the detention, release, and treatment of minors in the custody of" immigration authorities. *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016). Under the Agreement, "within five days of arrest, [DHS] must transfer the minor to a non-secure, licensed facility." *Id.* at 902–03.

However, the Flores Agreement "does not address … the housing of family units and the scope of parental rights for adults apprehended with their children," and "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'" *Id.* at 906; *see also United States v. Dominguez-Portillo*, 2018 WL 315759, *9 (W.D. Tex. Jan. 5, 2018).

Nor does the Flores Agreement provide any rights to adult detainees, including any rights of release. *Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 WL 315759 at *14–15; *Bunikyte v. Chertoff*, 2007 WL 1074070, *16 (W.D. Tex. Apr. 9, 2007). And although the Flores Agreement prefers the release of minors to a parent, this preference "does not mean that the government must also make a parent available; it simply means that, if available, a parent is the first choice." *Flores*, 828 F.3d at 908.

3

II.    FACTUAL ALLEGATIONS AND ADDITIONAL RELEVANT FACTUAL BACKGROUND

A.    Allegations in the Complaint regarding the Plaintiffs in this case

Despite its length, the Complaint makes generalized assertions and alleges few specific facts about government conduct directed at these Plaintiffs, D.C.B. and Mr. B.

The Complaint alleges that D.C.B. (a minor) and Mr. B. (D.C.B.'s father) left Brazil together on October 21, 2017, and entered the United States together about a month later, on November 18 or 19, 2017. *Id.* ¶¶ 17–20, 82–84. It vaguely alleges that Plaintiffs "presented themselves at the U.S.-Mexico border and were detained." *Id.* ¶ 85. And it alleges that Plaintiffs were detained together for three days, *id.* ¶¶ 85–86, but on November 22, 2017, they were separated: Mr. B. was taken to a detention facility in Texas, while D.C.B. was placed by ORR at a facility in Chicago Illinois. *Id.* ¶¶ 87, 89.

It also alleges that after 29 days, D.C.B. was reunited with his mother on December 23, 2017.[2] *Id.* ¶¶ 94, 101. And it (inconsistently) alleges that D.C.B. was separated from Mr. B. for "over four weeks," *id.* ¶ 9, or "60 days," *id.* ¶¶ 94, 102.

B.    Additional information from records relevant to Plaintiffs' claims

Relevant other records, which the Court may consider on this motion to dismiss,[3] provide additional information, and show that on November 20, 2017, D.C.B. and Mr. B. applied for admission to the United States at the Eagle Pass International Bridge Port of

---

[2] The Complaint vaguely alleges that D.C.B.'s mother (who is also Mr. B.'s wife), had separately entered the United States in mid-October 2017, and was released from detention about a month later. *Id.* ¶ 84. She is not a plaintiff in this case.

[3] In a factual challenge under Rule 12(b)(1), the Court may consider evidence outside the pleadings, because the presumption of truth of the allegations does not apply, and the existence of disputed material facts will not preclude the Court from evaluating the merits of jurisdictional claims. *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). In a facial challenge, the Court considers the complaint's allegations and documents it references or attaches in the light most favorable to the plaintiff, *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000), but the Court may still consider public documents and websites. *See, e.g., Maliandi v. Montclair State Univ.*, 845 F.3d 77, 89 n.10 (3d Cir. 2016). In deciding a Rule 12(b)(6) motion, the Court may consider documents integral to or relied on in the complaint, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), or authentic documents on which the claims are based, *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Entry, in Eagle Pass, Texas. *See* Ex. 1 at 1–3, 5–7.[4] Plaintiffs requested asylum based on a credible fear claim of being returned to Brazil. *Id.* Pending a disposition of the credible fear claim, immigration officials at the Eagle Pass, Texas port of entry decided: (1) to process Mr. B. as Expedited Removal/Credible Fear ("ER/CF") and detain him; and (2) to process D.C.B. as a UAC and transfer him to ORR to be sheltered. Ex. 1 at 3–4, 7–8.

On November 21, 2017, ORR approved D.C.B.'s placement at Casa Heartland at Princeton, an ORR-contract facility in Chicago, Illinois, operated by Heartland Alliance, and he was transferred there the next day. *See* Ex. 1 at 4; Ex. 2. On November 22, 2017, Heartland Family Reunification Specialists conducted an intake assessment of D.C.B. *See* Ex. 2 at 1. Although D.C.B. identified his mother as someone he knew in the United States, he had no contact information for her. *See id.* at 1, 3. Between November 22 and December 3, 2017, Heartland Family Reunification Specialists tried numerous times to contact D.C.B.'s mother, but were unable to reach her. *Id.* at 4–6. But on December 3, 2017, they reached D.C.B.'s mother and immediately began the application process for her to take custody of D.C.B., which was completed on December 20, 2017. *Id.* at 4–9.

Heartland's "30 Day Follow-up Call Questionnaire" shows that D.C.B. was discharged and released to his mother on December 21, 2017. *See* Ex. 3 ("D/C Date"). Heartland's records also show that during D.C.B.'s time in ORR custody, he spoke by phone with his mother on seven different occasions, *see* Ex. 4 at 1, and that he spoke with his father, Mr. B., twice, on December 1 and December 13, 2017, *see id.* at 1–2.

## III.    LEGAL STANDARDS OF REVIEW AND APPLICABLE LAW

### A.    Dismissal for lack of subject matter jurisdiction

Under Rule 12(b)(1), the Court must dismiss claims which lack subject matter jurisdiction. It is presumed that causes fall outside federal courts' jurisdiction, *Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994), and at all stages of litigation, the plaintiff

---

[4] Due to their content, the United States is filing the exhibits to this motion to dismiss separately, under seal, as well as an unopposed motion for leave to file them under seal.

must establish subject matter jurisdiction, *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1045 (3d Cir. 1993). The Court will consider jurisdictional claims regardless of disputed material facts, and allegations are not construed as presumptively truthful. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

> ### B.    Dismissal for failure to state a cognizable claim

Under Rule 12(b)(6), the Court must dismiss an action if the complaint fails to plead enough facts to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Legal conclusions and bare recitals of a cause of action supported by mere conclusory statements are insufficient. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

> ### C.    The FTCA's limited waiver of sovereign immunity

"The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). And the United States waives sovereign immunity only to the extent that Congress, by statute, consents to the waiver. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Such a waiver "must be unequivocally expressed in statutory text, and will not be implied," *Lane v. Peña*, 518 U.S. 187, 192 (1996), and a waiver may not be found—or extended—by implication. *See Lehman v. Nakshian*, 453 U.S. 156, 161 (1981); *Testan*, 424 U.S. at 399-400; *United States v. Williams*, 514 U.S. 527, 531 (1995). Finally, "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane*, 518 U.S. at 192. That is, when confronted with any purported waiver of the Government's sovereign immunity, the Court must construe ambiguities in favor of immunity, not in favor of a claim. *Id.*; *Doe 1 v. United States*, 37 F.4th 84, 88 (3d Cir. 2022).

The FTCA provides a limited waiver of sovereign immunity for actions in tort against the United States under certain circumstances. 28 U.S.C. § 1346(b)(1). But no liability attaches under the FTCA except where expressly authorized by Congress, and a

plaintiff must demonstrate an unequivocal waiver of immunity to prove the court has jurisdiction over his claims. *United States v. Kubrick*, 444 U.S. 111, 117–18 (1979).

IV.    ARGUMENT

"To unlock the courthouse door and sue the federal government, a plaintiff needs two keys. He must have a cause of action so he can invoke the power of the courts to remedy his injury. And Congress must have waived sovereign immunity for the specific remedy he seeks." *Doe 1*, 37 F.4th at 86 (cleaned up). Here, Plaintiffs have neither of the required keys to sue the government and their claims must be dismissed.

### A.    The Court lacks subject matter jurisdiction under the FTCA

Most of the Complaint's paragraphs contain anti-government vitriol, legal conclusions, and irrelevant factual assertions about the treatment of other migrants. But essentially, Plaintiffs claim that the government wrongly separated D.C.B. from Mr. B. and should thus be held liable for money damages under the FTCA. *See* ECF 1 ¶¶ 9–13.

Plaintiffs are wrong. That is—regardless of their copious allegations about what happened to *other* migrants from Latin America—here, exceptions to the FTCA will bar these Plaintiffs' claims for government conduct that actually relates to: [1] the separation of D.C.B. from Mr. B. (*not of any other migrants*); [2] at the Eagle Pass, Texas port of entry (*not anywhere else along the border*); [3] in late November 2017 (*not at any other time*).

### 1.    The Discretionary Function Exception bars Plaintiffs' claims

### a.    The Discretionary Function Exception to the FTCA

The United States cannot be sued for tort claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The FTCA's "discretionary function exception" thus prevents judicial second-guessing of decisions grounded in social, economic, or political policy. *United States v. Varig Airlines*, 467 U.S. 797, 813–14 (1984).

A two-part test governs the exception. *United States v. Gaubert*, 499 U.S. 315 (1991). *First*, the Court must decide whether the challenged conduct involved an "element of judgment or choice," *i.e.*, whether a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Mitchell v. United States*, 225 F.3d 361, 363-64 (3d Cir. 2000). Because if a federal statute, regulation, or policy specifically prescribes a course of action, the exception does not apply because the employee has no rightful option but to adhere to the directive. *Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008).

*Second*, "if the challenged conduct involves an element of judgment, the court must determine 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id*. However, the focus "is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 324–25. "It is irrelevant whether the government employee actually balanced economic, social, and political concerns in reaching his or her decision." *U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988). And "the test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion." *Smith v. Johns-Manville Corp.*, 795 F.2d 301, 308–09 (3d Cir. 1986).

"In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz v. United States*, 486 U.S. 531, 537 (1988). And if applicable, the exception bars tort claims even if the discretion was allegedly abused. 28 U.S.C. § 2680(a). Where the discretionary function exception applies, the Court should dismiss the claim under Rule 12(b)(1), because the exception limits the court's subject matter jurisdiction. *Gotha v. United States*, 115 F.3d 176, 178–79 (3d Cir. 1997).

### b.    The government conduct challenged in Plaintiffs' Complaint involved non-mandatory judgment

In November 2017, when Plaintiffs were found inadmissible at the Eagle Pass, Texas port of entry, but requested asylum, the INA provided they "shall be detained pending a final determination" of their claims. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); *see also* 8 U.S.C. § 1225(b)(2)(A). And while DHS had discretion to temporarily grant parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A), Plaintiffs do not allege they applied for a discretionary grant of parole. The validity of their initial detention is therefore not at issue here.

Instead, Plaintiffs' tort claims arise from their separation after they were already in the custody of immigration officials. And as one court has explained, when as here, DHS encountered a removable adult (Mr. B.) traveling with his removable child (D.C.B.), immigration officials had three possible responses: (1) release both into the United States; (2) detain the adult, and then either release the child to another parent or legal guardian, or transfer him to ORR as a UAC; or (3) detain both together by placing them at family detention center during their immigration proceedings. *See Flores v. Rosen*, 984 F.3d 720, 742 (9th Cir. 2020).

Here, the immigration officers chose the second option: to detain just Mr. B.—and because he would therefore be unable to care for his son (and no other parent was immediately available to take custody), they transferred D.C.B. to ORR for placement as a UAC. *See* Ex. 1 at 2–4. And that decision satisfies both prongs of the discretionary function analysis.

*First*, the conduct was discretionary, as it "involve[d] an element of judgment or choice." *Berkovitz*, 486 U.S. at 536. And agency decisions made at the operational level (not just at the policy-planning level), can involve the exercise of protected discretion. *Gaubert*, 499 U.S. at 325–26; *Layton v. United States,* 984 F.2d 1496, 1500 (8th Cir. 1993).

*Second*, the choice to detain Mr. B., while transferring D.C.B. to ORR, is replete with policy considerations.[5] As noted above, although the INA provides that asylum seekers should be detained during immigration proceedings, the government has broad statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."[6] 8 U.S.C. § 1231(g)(1). The immigration officers therefore had to consider what was the best option to care for D.C.B., a minor, while his father was detained and his mother's whereabouts were unknown.

Courts have held that decisions regarding detention placement are protected by the discretionary function exception.[7] And courts have held that officials have discretion to separate families detained at the border—especially here where, as discussed below, *no mandatory policy* applied that would have *required* the Plaintiffs' separation. *See, e.g., K.O. v. United States*, 2023 WL 131411, *7 (D. Mass. Jan. 9, 2023).

The discretionary function exception would also apply to bar any claims relating to Plaintiffs' "conditions of confinement," because how the government manages and operates its detention facilities involves discretionary decisions susceptible to policy considerations. *See Rinaldi v. United States*, 904 F.3d 257, 273–74 (3d Cir. 2018); *Donaldson*

---

[5] As the Ninth Circuit noted, no option is perfect: the government views a full release as problematic because it creates incentives for bringing children on the dangerous journey to cross the border and many families released into the United States fail to appear for their removal proceedings; family separation generates unwanted litigation; and joint detention is difficult because the government must satisfy the housing requirements of the Flores Agreement. *See* 984 F.3d at 742. And likewise, other courts have noted that detention of family units pending resolution of asylum claims can be "extremely challenging" due to limited space in acceptable family-detention facilities. *See, e.g., Las Ams. Immigrant Advoc. Ctr. v. Wolf*, 507 F.Supp.3d 1, 36–37 (D.D.C. 2020).

[6] Indeed, "Congress has placed the responsibility of determining where aliens are detained within the discretion" of DHS. *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986); *see also Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999).

[7] *See, e.g., Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018); *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003); *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998); *Bailor v. Salvation Army*, 51 F.3d 678, 685 (7th Cir. 1995); *Peña Arita v. United States*, 470 F.Supp.3d 663, 691–92 (S.D. Tex. 2020); *D.B. v. Poston*, 119 F.Supp.3d 472, 482 (E.D. Va. 2015).

*v. United States*, 281 F.App'x 75, 77 (3d Cir. 2008) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 n.14 (1981)); *Lackner v. United States*, 2025 WL 314965, *10 (D.N.J. Jan. 28, 2025).

Likewise, to the extent Plaintiffs challenge ORR's decision to place D.C.B. at the Heartland facility in Chicago,[8] the discretionary function exception applies to bar such a claim because "it is clear that the ultimate choice of facility for housing unaccompanied alien children is a decision vested with policy considerations." *Walding v. United States*, 955 F.Supp.2d 759, 771–72 (W.D. Tex. 2013).

Also barred are any claims that the government negligently failed to track D.C.B. once he was transferred to ORR, or to facilitate communication between D.C.B. and Mr. B., because any such claims arise directly from officials' discretionary decision to separate the Plaintiffs, and are barred by the discretionary function exception for the same reasons. *See Sloan v. U.S. Dep't of HUD*, 236 F.3d 756, 762 (D.C. Cir. 2001) (claims "inextricably linked" to conduct protected by § 2680(a) are also barred by it). Moreover, because the FTCA does not permit a tort challenge with respect to how an agency chooses to "distribute its finite resources," *Mitchell v. United States*, 225 F.3d 361, 364 (3d Cir. 2000), the exception would protect government decision-making regarding when, with what frequency, and the means to afford communication between aliens in secure immigration detention and their separated children, which would involve balancing various policy considerations, including accessibility and cost of communications, staffing and resource allocation. *See, e.g., Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir.

---

[8] Because Heartland is not an "employee" of the federal government, the independent-contractor exception to the FTCA would bar any claims related to alleged acts or omissions at Heartland. *See* 28 U.S.C. § 2671; *United States v. Orleans*, 425 U.S. 807, 814 (1976); *Logue v. United States*, 412 U.S. 521, 527 (1973); *Norman v. United States*, 111 F.3d 356, 357 (3d Cir. 1987). And although the Complaint cites generalized complaints made by others about Heartland's management or the condition of its facilities, ECF 1 ¶ 90, and asserts that while there, D.C.B. was "forced to clean bedrooms and bathrooms," *id.* ¶ 91, Plaintiffs make no apparent tort claims related to D.C.B.'s own time at Heartland; nor does their Complaint allege that the federal government dictated or controlled conditions at the facility. *Cf. C.D.A.*, 2023 WL 2666064 at *17.

1994) *Calderon v. United States*, 123 F.3d 947, 951 (7th Cir. 1997); *Harrison v. Fed. Bureau of Prisons*, 464 F.Supp.2d 552, 559 (E.D. Va. 2006).

        **c.**      **Plaintiffs cannot rely on policies that did not apply to them**

Plaintiffs' attempts to assert and rely on alleged conduct involving *other migrants* must fail because the FTCA requires individualized claims. *See Pennsylvania v. Nat'l Ass'n of Flood Insurers*, 520 F.2d 11, 23 (3d Cir. 1975) (claimants must separately and individually satisfy all jurisdictional requirements of the FTCA); *cf. Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996) (an FTCA claim "must be specific to the plaintiff, and not some amorphous, free-floating duty to society."). Moreover, Plaintiffs' various allusions to alien-detention or family-separation "policies" that may have applied to other migrants, at a different time, or in a different place, cannot—by implication—overcome the discretionary function exception that applies to their claims.

Specifically, the Complaint broadly asserts that the first Trump Administration instituted a "family separation policy." ECF 1 ¶¶ 1, 8–9, 137. But then it only vaguely suggests that Plaintiffs' separation resulted from the so-called "Zero Tolerance Policy," referring to an April 6, 2018 memorandum from the then-Attorney General directing prosecutors on the Southwest border "to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)."[9] *See* ECF 1 ¶¶ 33–35. But Plaintiffs do not allege that this "Zero Tolerance Policy" applied to them. Nor could they, because, as they allege, the policy was not proposed until December 2017—the month *after* their separation— and it was not announced until several months later, in April 2018. *See* ECF 1 ¶¶ 30–33.

---

[9] *See* www.justice.gov/archives/opa/press-release/file/1049751/dl?inline. Section 1325(a) makes it a crime for an alien to (1) enter or attempt to enter the United States at any time or place other than as designated by immigration officers; (2) elude examination or inspection by immigration officers; or (3) attempt to enter or obtain entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact. Plaintiffs do not allege that it applied to them, and while their request for asylum triggered statutory detention, it was not a violation of 8 U.S.C. § 1325.

Likewise, the Complaint vaguely suggests that Plaintiffs' separation was the result of a "family separation pilot program," established in July 2017, within CBP's El Paso Sector. *See* ECF 1 ¶¶ 27–29, 33. But again, Plaintiffs do not allege that this "El Paso pilot program" applied to them. Nor could they, for two reasons. First, the Eagle Pass, Texas port of entry is outside the El Paso Sector's geographic area.[10] Second, the El Paso pilot program only applied to the U.S. Border Patrol, and not to the Office of Field Operations (OFO), the separate component that manages the ports of entry.[11]

Consequently, Plaintiffs do not allege, and cannot show a mandatory Executive policy that ***required their own November 2017 separation, in Eagle Pass, Texas***. And because Plaintiffs' separation did not stem from the Zero Tolerance Policy or the El Paso Sector pilot program, Plaintiffs cannot defeat the discretionary function exception (or otherwise state a cognizable FTCA claim) by relying on those inapplicable policies.

For that reason, Plaintiffs cannot rely on *C.D.A. v. United States*, 2023 WL 2666064 (E.D. Pa. Mar. 28, 2023) (Smith, J.). Indeed, *C.D.A.*'s holding—that the discretionary function exception did not apply to alleged family separations occurring in "late-spring 2018," *id.* at *3—explicitly depended on how the Attorney General's April 2018 memorandum "prescribed a course of action for federal employees to follow," which removed employee discretion for the challenged conduct. *Id.* at *14. But it did not apply to alleged family separations, like Plaintiffs' here, that occurred long before April 2018.

Likewise, despite repeatedly citing it in their Complaint, Plaintiffs cannot rely on the class action matter of *Ms. L. v. ICE*, Civ. No. 18–428 (S.D. Cal.), filed in February 2018, or on the June 2018 decision in that case that enjoined the Zero Tolerance Policy

---

[10] *See* www.cbp.gov/border-security/along-us-borders/border-patrol-sectors (the Eagle Pass, Texas port of entry is within the separate Del Rio Sector).

[11] *See, e.g., Orantes-Hernandez v. Gonzales,* 504 F.Supp.2d 825, 859 n.85 (C.D. Cal. 2007) (explaining that the OFO is responsible for processing individuals seeking entry through ports of entry, while the Border Patrol, a separate DHS component, is charged with detecting and preventing illegal entry between ports of entry).

and mandated reunification efforts for separated families. *See Ms. L. v. ICE*, 302 F.Supp.3d 1149, 1166–67 (S.D. Cal. 2018). Indeed, that decision was issued at least six months after Plaintiffs' own separation and reunification, and could not have affected the Plaintiffs.

Instead, here, Plaintiffs' own claims fall within the government's well-established general discretion with respect to the detention of noncitizens. *See, e.g., D.J.C.V. v. United States*, 687 F.Supp.3d 423, 448 (S.D.N.Y. 2023) (collecting cases). Thus, Plaintiffs' claims are barred by the discretionary function exception and must be dismissed.

### 2.    The Due Care Exception to the FTCA also bars Plaintiffs' claims

The United States cannot be sued for tort claims "based upon an act or omission of an employee of the government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." 28 U.S.C. § 2680(a). Under this "due care" exception, "where government employees act pursuant to and in furtherance of regulations, resulting harm is not compensable under the act." *Dupree v. United States*, 247 F.2d 819, 824 (3d Cir. 1957); *see also Accardi v. United States*, 435 F.2d 1239, 1241 (3d Cir. 1970); *Welch v. United States*, 409 F.3d 646, 652–53 (4th Cir. 2005).

Among other things, the purpose of the due care exception is to prevent the testing "of the legality of statutes and regulations" through a tort action. *Dalehite v. United States*, 346 U.S. 15, 33 (1953); *Powell v. United States*, 233 F.2d 851, 855 (10th Cir. 1956). Accordingly, where a government employee's actions are authorized by statute or regulation, the due care exception applies. *See Borquez v. United States*, 773 F.2d 1050, 1053 (9th Cir. 1985); *FDIC v. Citizens Bank & Trust Co. of Park Ridge, Ill.*, 592 F.2d 364, 366 (7th Cir. 1979). *See, e.g., Pooler v. United States*, 609 F.Supp. 198, 202 (E.D. Pa. 1985).

Here, the due care exception bars the Plaintiffs' FTCA claims because the United States had the statutory authority to determine whether and where to detain them after they entered the country, *see* 8 U.S.C. §§ 1225, 1226(a), 1231(g)(1), and the authority—indeed, the duty—to place any minor children in the custody and care of ORR while the

accompanying parent was detained, *see* 8 U.S.C. §§ 1232(b)(3), 1232(c)(2)(A); *id*. § 279(g). Enforcement of immigration laws in a way authorized by statute cannot form the basis of an FTCA claim.[12] Thus, Plaintiffs' claims are barred by the due care exception.

*       *       *

In sum, the combined operation of the discretionary function and due care exceptions bars Plaintiffs' tort claims. *See, e.g.*, *S.E.B.M. v. United States*, 659 F.Supp.3d 1249, 1271–75 (D.N.M. Mar. 6, 2023) (finding that the due care and discretionary function exceptions applied to the following conduct: (1) the plaintiff's "physical separation from her father"; (2) "her limited contact with her father while in government custody"; (3) "her placement in ORR custody"; and (4) "being made to wait 160 days before she was placed in her grandmother's care"). The Court should therefore dismiss the Complaint for lack of subject matter jurisdiction.

### 3.  The Court should also dismiss Plaintiffs' emotional distress claims because the FTCA does not authorize systemic tort claims.

Even if Plaintiffs had alleged that some version of the Zero Tolerance Policy applied to them, their claims for infliction of emotional distress are barred because the Complaint alleges a systemic claim based on an alleged government-wide effort to inflict distress, rather than claims based on the acts of individual federal employees.

The FTCA only allows a suit for damages arising from certain torts committed by federal employees acting within the scope of their employment. 28 U.S.C. §1346(b)(1); *Lichtman v. United States*, 316 F.App'x 116, 120 (3d Cir. 2008). And the terms "person" and "employee," as used in the FTCA, mean individuals and natural persons, not institutions or corporate entities. *Daniels v. United States*, 2021 WL 2327856, *2 (E.D. Pa. June 1, 2021) (citing *Rayonier Inc. v. United States*, 352 U.S. 215 (1957)); *Adams v. United*

---

[12] In *C.D.A.*, the court held that the due care exception did not apply because employees were "conforming" with the "zero-tolerance *policy*, which is neither a statute nor regulation." 2023 WL 2666064, at *15 (emphasis in original). But here, as explained above, Plaintiffs' November 2017 detention and separation occurred months before the Zero Tolerance Policy, and in a different location than the El Paso Sector pilot program.

*States*, 420 F.3d 1049, 1052–55 (9th Cir. 2005); *Ochran v. United States*, 117 F.3d 495, 506 (11th Cir. 1997). Therefore, "plaintiffs may not assert 'systemic' claims against the Government writ large," but must allege tortious conduct by individual officers, acting within the scope of their employment, for whom the United States has assumed liability under the FTCA. *B.Y.C.C. v. United States*, 2023 WL 5237147, *8 (D.N.J. Aug. 15, 2023).

In *B.Y.C.C.*, the court held that family separation claims arising from "the actions of individual Government employees" could proceed. *Id.* Here, however, Plaintiffs' emotional distress claims do not allege that any individual officer "inflict[ed] severe emotional distress" on Plaintiffs. *Bill Wyly Dev., Inc. v. Smith*, 680 S.W.3d 679, 689 (Tex. App. 2023) (discussing IIED claim under Texas law, which applies here).

Instead, the Complaint is unambiguous in its theory that the federal government, writ large, implemented a nationwide "policy … to systemically terrorize and punish" migrants and to intentionally inflict emotional distress on parents and children through family separation. ECF 1 ¶ 1; *see also id.* ¶ 6 ("DHS also systemically refused to facilitate adequate communication between the parents and children during their separation.").

But the FTCA's waiver of sovereign immunity does not encompass such "systemic," institutional tort claims or "generalized theories" of tortious conduct "asserted against the staff and employees of federal institutions as a whole." *Lee v. United States*, 2020 WL 6573258, *6 (D. Ariz. Sept. 18, 2020). The Court should therefore dismiss Plaintiffs' "systemic" emotional distress claims, and any other claims allegedly attributable to a nationwide policy, as opposed to acts by individual federal employees.

### 4.    Plaintiffs' FTCA claims are also barred to the extent they sound in constitutional tort rather than state common-law tort

The Complaint obliquely asserts that a "policy" denied Plaintiffs' "fundamental constitutional rights … including the right to family integrity, on a discriminatory basis," ECF 1 ¶ 2, a "policy" of separating children and parents, *id.* ¶ 64, and a "failure to track the children and promptly reunite the families once they were separated

16

violated the constitutional right to family integrity," *id.* ¶ 75. And it vaguely asserts that the conditions of Plaintiffs' three-day confinement at the Eagle Pass, Texas port of entry were "very poor," and that "the guards" mistreated Plaintiffs. *Id.* ¶¶ 86–88.

But because these and similar claims sound in constitutional tort, not state-law tort, they are barred. *FDIC v. Meyer*, 510 U.S. 471, 477–78 (1994). Again, a claim is actionable under the FTCA only if the United States would be liable as a "private person" under "the law of the place where the act or omission occurred," *id.*, and "a constitutional tort claim … could not contain such an allegation." *Id.* at 477. Thus, "the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims." *Id.* at 478. The only means to obtain money damages against federal officials for a constitutional violation or a "conditions of confinement" claim is under *Bivens*, *see Lang v. Sauers*, 529 F.App'x 121, 124 (3d Cir. 2013), which Plaintiffs have not brought.

**B.    The Complaint also states no cognizable tort claims under the FTCA**

Even if the Court holds that the FTCA waives sovereign immunity for Plaintiffs' claims, it should nonetheless still dismiss Counts I–IV of the Complaint, under Rule 12(b)(6), because Plaintiffs fail to state a cognizable claim for the torts of [1] intentional infliction of emotional distress (IIED), [2] negligent infliction of emotional distress (NIED), [3] negligence, or [4] loss of consortium, under the applicable Texas law.[13]

**1.    Plaintiffs fail to state an IIED claim**

Under Texas law, an IIED claim requires a plaintiff to establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme

---

[13] The FTCA determines tort liability "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), meaning the "whole law" of the state. *Gould Elecs.*, 220 F.3d at 179. Here, the alleged conduct by government officials related to Plaintiffs' detention and separation indisputably occurred in Texas. *See* Ex. 1; ECF 1 ¶¶ 87, 95. To the extent Plaintiffs allege injuries resulting from the separation while D.C.B. was housed in Chicago, Illinois, as noted above, Heartland was an independent contractor, not a government employee, so the FTCA does not apply to its conduct; and the Supreme Court has rejected the argument that the law of the place of injury should apply where conduct occurring in one state results in injury in another. *Simon v. United States*, 341 F.3d 193, 200 (3d Cir. 2003) (citing *Richards v. United States*, 369 U.S. 1 (1962)).

and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006). A defendant's conduct satisfies the second element only if it is "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decent, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (quoting Restatement (Second) of Torts § 46 cmt. d). "Meritorious claims for intentional inflictions of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Suberu*, 216 S.W.3d at 796. And recovery for IIED must typically be based on circumstances that border on "serious criminal acts." *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 818 (Tex. 2005). Plaintiffs do not allege facts meeting this high standard.

### a.    Plaintiffs' separation was not the result of a policy

Plaintiffs' IIED claim (Count I) asserts that "Mr. B's forced separation from his child was directed as part of a broader policy designed to inflict maximal punishment, stress and trauma on asylum seekers so as to deter future migrants from seeking asylum in the United States." ECF 1 ¶ 109. But as discussed above, Plaintiffs cannot plausibly allege that their separation here was the result of any policy. *See* Section IV.A.1.c., *supra*; *Iqbal*, 556 U.S. at 677 (allegations that officials knew of other officials' unlawful conduct, *i.e.*, guilt-by-association, are insufficient to state a cognizable claim). Accordingly, these Plaintiffs cannot show the government acted intentionally or recklessly towards these Plaintiffs by implementing or tolerating a policy that did not actually apply to them.

### b.    Plaintiffs' separation was not extreme and outrageous

Plaintiffs' claim similarly fails because it is premised on the actions of federal officers performing their duties as permitted by law, which cannot constitute extreme and outrageous conduct. *See Hart v. O'Brien*, 127 F.3d 424, (5th Cir. 1997) (under Texas law, conduct that is required or authorized by law cannot be extreme or outrageous).

As discussed above, when Plaintiffs applied for admission and requested asylum, the INA stated they "shall be detained" pending further proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Officials then made the discretionary decision to detain Mr. B., leading to Plaintiffs' separation, and the discretionary decision to place D.C.B. in a facility for UACs. *See* 8 U.S.C. § 1232(b)(3); *see also id*. § 1232(a)(3). Moreover, Plaintiffs acknowledge D.C.B. did speak with his father during his placement. ECF 1 ¶¶ 9, 98.

All these actions arose from the decisions and conduct taken to enforce federal immigration law, which cannot be considered extreme or outrageous under Texas law.

### 2. Plaintiffs fail to state any negligence claim

#### a. Texas law does not recognize a claim for NIED

Plaintiffs' NIED claim (Count II) merely states the legal conclusion that government officials breached a duty of care owed to Plaintiffs, causing them emotional distress. ECF 1 ¶¶ 114–116. This does not satisfy the *Iqbal* pleading standards. *See* 556 U.S. at 677–679. But more importantly, Texas law does not recognize NIED claims, regardless of the severity of the alleged emotional distress that is suffered, foreclosing any claim here. *See C.D.A.*, 2023 WL 2666064, at *23; *B.Y.C.C.*, 2023 WL 5237147 at *52.

#### b. Negligence claims require allegations of physical injury

Plaintiffs' claim of general "negligence" (Count III) also fails because Texas law requires showing *physical*, not just mental or emotional, injury to succeed. *See Temple-Inland Forest Prods Corp. v. Carter*, 993 S.W.2d 88, 91 (Tex. 1999) (negligent breach of duty "is not a wrong for which mental anguish is compensable absent physical injury"). And Texas law distinguishes between physical injuries (which are cognizable) and physical manifestations of emotional distress (which are not cognizable). *See Chapa v. Traciers & Assocs.*, 267 S.W.3d 386, 397 (Tex. App. 2008). *See, e.g., Villafuerte v. United States*, 2017 WL 8793751, at *10–11 (S.D. Tex. Oct. 11, 2017) (detainee's alleged mental and emotional harms were insufficient to support a negligence claim); *Pelayo v. 24 Hour Fitness USA, Inc.*, 2019 WL 6686702, *4 (S.D. Tex. Nov. 21, 2019) (dismissing negligence claim where

injuries "involve[d] only mental anguish"). So here, the alleged mental and emotional distress is insufficient to state a negligence claim under Texas law and thus, the FTCA.

### c.    Plaintiffs also fail to allege a cognizable duty

The Court should also dismiss Plaintiffs negligence claims arising from their separation for failure to identify an applicable duty under Texas law. To maintain a negligence claim, a plaintiff must show "the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *Kristensen v. United States*, 993 F.3d 363, 368 (5th Cir. 2021); *D. Houston, Inc. v. Love*, 92 S.W. 3d 450, 454 (Tex. 2002). The existence of a duty is a threshold question of law. *Van Horn v. Chambers*, 970 S. W. 2d 542, 544 (Tex. 1998); *see also Tripp v. United States*, 257 F.Supp.2d 37, 45 (D.D.C. 2003).

Here, Plaintiffs have failed to plausibly allege that their separation resulted from any actionable breach of duty. They assert that the government violated a "duty to act with ordinary care." ECF 1 ¶¶ 119–120. But "courts may not hold people to very general duties of exercising ordinary care in all circumstances. Rather, Texas law requires the court to be more specific, to balance the relevant factors in determining the existence, scope, and elements of legal duties." *Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 145 (Tex. 2022). And no state-law duty required releasing an alien with a child or housing children with parents who are lawfully detained. *Cf. Davis v. Carlson*, 837 F.2d 1318, 1318 (5th Cir. 1998) (prison had no duty to transfer a prisoner to be near his wife); *Rathod v. Barr*, 2020 WL 1492790, *5 (W.D. La. Mar. 5, 2020) (aliens have no right to be housed in a particular facility). Further, when Plaintiffs were found inadmissible, but requested asylum, the INA said they "shall be detained pending a final determination of credible fear of persecution." 8 U.S.C. § 1225(b)(1)(B)(iii); *see also* 8 U.S.C. §§ 1232(a)(3), 1232(b)(3). The government has no duty to refrain from enforcing federal law and, thus, cannot breach any state-law duty by doing so.

      **d.**      **Plaintiffs fail to state a claim related to communications**

While unclear, to the extent Plaintiffs purport to bring a distinct negligence claim that the United States failed to provide adequate information, or to facilitate interactions during their separation, Plaintiffs similarly fail to state a claim. Limitations on personal communications are a natural consequence of detention, and there is no duty for the government to ensure communications with family members. *See, e.g., Al Odah v. United States*, 406 F.Supp.2d 37, 45 (D.D.C. 2005). Moreover, the Complaint belies this claim when it alleges that Mr. B. was provided information about D.C.B.'s whereabouts and well-being, and had opportunities to communicate directly with him. ECF 1 ¶¶ 9, 198. And the related records show that D.C.B. spoke with both his father and his mother regularly while at Heartland, before being reunited with them. *See* Ex. 4 at 1.

      **3.**      **Plaintiffs fail to state a loss of consortium claim**

Texas law "does not recognize claims for parental loss of consortium based on purely emotional harm." *Rodriguez v. H.E. Butt Grocery Co.*, 2021 WL 4597106, *8 (Tex. App. Oct. 7, 2021); *see also Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990) ("to successfully maintain a claim for loss of parental consortium resulting from injury to the parent child relationship, the plaintiff must show that the defendant physically injured the child's parent in a manner that would subject the defendant to liability."); *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 294 (Tex 1994). And a claimant "may not recover for loss of consortium absent a physical injury that is serious, permanent and disabling." *Verinakis v. Med. Profiles, Inc.*, 987 S.W.2d 90, 99 (Tex. App. 1998) (citing *Browning-Ferris Indus.*, 881 S.W.2d at 294). Importantly, as applicable here, loss of consortium does not include an element of mental anguish. *Reagan*, 804 S.W.2d at 467.

Here, Plaintiffs assert that they have suffered "severe, permanent, and disabling injuries," but allege only "emotional and psychological" damage, not physical injuries. ECF 1 ¶ 123. Plaintiffs therefore cannot state a cognizable loss of consortium claim.

4.    **Alternatively, all Plaintiffs' FTCA claims fail under Texas law because the claims challenge privileged conduct**

The United States may, in an FTCA case, invoke state law privileges as a defense to liability. *See Villafranca v. United States*, 587 F.3d 257 (5th Cir. 2009); *see also B.Y.C.C.*, 2023 WL 5237147, *10. And Texas law provides that actions are not considered tortious if the conduct is privileged. *See Hinojosa v. City of Terrell*, Tex., 834 F.2d 1223, 1231 (5th Cir. 1988). This principle applies here because the conduct Plaintiffs challenge—the detention of Mr. B. under the INA and the consequent separation and designation of D.C.B. as an unaccompanied alien child—was authorized under federal law.

*Tovar v. United States*, 2000 WL 425170 (N.D. Tex. Apr. 18, 2000), illustrates this principle. In that case, the district court considered the United States' liability under the FTCA for a claim of false imprisonment stemming from the plaintiff's detention by immigration agents. Regarding the United States' liability, the court looked to the legal authority under which the agents acted, *i.e.,* federal immigration law. *Id.* at *6. Because federal immigration statutes authorized the challenged conduct, the agency "acted under authority of law," and the conduct was privileged under Texas law. *Id.* at *7.

The courts in *C.D.A.* and *B.Y.C.C.* rejected a privilege defense because the government relied on cases involving claims of false arrest or imprisonment. *See B.Y.C.C.*, 2023 WL 5237147, at *10; *C.D.A.*, 2023 WL 2666064, at *22. But the defense is not limited to claims of false arrest, and it applies to intentional and negligent tort claims. *See Mendez v. Poitevent*, 823 F.3d 326, 334 (5th Cir. 2016) (applying Texas privilege defense to intentional torts besides false arrest); *see also Andrade v. United States*, 116 F.Supp.2d 778, 787–89 (W.D. Tex. 2000). Indeed, the defense here is consistent with Restatement § 890, which Texas courts apply. *See Twyman*, 855 S.W.2d at 621–22.

C.    **The Court also lacks subject matter jurisdiction under the ATS**

Unlike the FTCA, the ATS, 28 U.S.C. § 1350, contains no express waiver of sovereign immunity. And "in light of Congress's failure to explicitly waive sovereign immunity, 'almost every court to consider the question has held that the United States is

immune from suit pursuant to the ATS, even for alleged violations of *jus cogens* norms, as the Complaint here articulates." *Flores Benitez v. Miller*, 687 F.Supp.3d 304, 325 (D. Conn. 2023) (quoting *D.J.C.V. v. United States*, 605 F.Supp.3d 571, 609 (S.D.N.Y. 2022)).

Indeed, no federal court of appeals, including the Third Circuit, has held that the ATS waives the government's sovereign immunity.[14] However, a few district courts, including the *C.D.A.* decision in this district, have held that the United States does not retain sovereign immunity for alleged violations of *jus cogens* norms of international law. *See C.D.A.*, 2023 WL 2666064 at *18–20. But more recent decisions have declined to follow that reasoning in the absence of a statutory waiver by Congress, *see Flores Benitez*, 687 F.Supp.3d at 325, and this Court should likewise hold that the absence of any express waiver of sovereign immunity requires dismissal of the Plaintiffs' ATS claims.

**D.    The Complaint also fails to state a cognizable claim under the ATS**

Even if the Court holds the ATS contains a waiver of federal sovereign immunity, it should still dismiss Counts V–VII, which rely on the ATS, under Rule 12(b)(6).

The ATS is "jurisdictional," and thus it creates "no new causes of action." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004); *see also Jesner v. Arab Bank, PLC*, 584 U.S. 241, 254 (2018). Rather, if there has been a violation of the law of nations or a treaty of the United States, the ATS allows it to be litigated in federal court. *See* 28 U.S.C. § 1350.

Therefore, for the ATS to apply, Plaintiffs here would have to allege and prove a violation of the law of nations or a treaty of the United States that gives rise to a tort. *See Bieregu v. Ashcroft*, 259 F.Supp.2d 342, 350–51 (D.N.J. 2003). And the Supreme Court has cautioned courts from liberally finding such a violation, noting that courts should only recognize private claims under federal common law for violations of any international

---

[14] *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206–07 (D.C. Cir. 1985); *Quintero Perez v. United States*, 8 F.4th 1095, 1100 (9th Cir. 2021); *Arar v. Ashcroft*, 532 F.3d 157, 175 n.12 (2d Cir. 2008); *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207, (D.C. Cir. 1985); *see also Rosner v. United States*, 231 F.Supp.2d 1202, 1210 (S.D. Fla. 2002); *Hawa Abdi Jama v. United States INS*, 22 F.Supp.2d 353, 365 (D.N.J. 1998).

law where such violations were well accepted among civilized nations when § 1350 was enacted by the First Congress in 1789. *See Sosa*, 542 U.S. at 724–25, 732; *see also Hereros ex rel. Riruako v. Deutsche Afrika-Linien Gmblt & Co.*, 232 F.App'x 90, 93–94 (3d Cir. 2007).

In other words, there must be a violation of a norm that is specific, universal, and obligatory. *Sosa*, 542 U.S. at 732–33; *Ben-Haim v. Neeman*, 543 F.App'x 152, 154 (3d Cir. 2013). And courts in this circuit finding a cognizable ATS claim have done so only where, for example, there are specific claims showing that alien detainees were not fed or clothed, beaten, sexually abused, harassed, and housed in subhuman conditions.[15]

The Plaintiffs' allegations here do not suffice. They use buzzwords including "torture," "crimes against humanity," "persecution," and "inhumane acts." *See* ECF 1 ¶¶ 1, 8, 12, 65, 127–129, 132–135, 142. But while their Complaint makes broad assertions about the government's treatment of *other migrants*, and then merely *suggests* that the same happened to the Plaintiffs, it alleges no specific facts about government conduct toward these Plaintiffs that would state a cognizable claim. That is, Plaintiffs have at most pleaded facts that would permit the Court to infer only "the mere possibility of misconduct," but have not plausibly suggested—as they must do to survive a motion to dismiss—that they are entitled to relief. *Iqbal*, 556 U.S. at 679. Plaintiffs' "unadorned, the-defendant-unlawfully-harmed-me accusation … will not do." *Id.* at 678.

Moreover, the execution of federal immigration law when Plaintiffs crossed the Southern border and which thereafter dictated their handling under federal statutes, does not equate to torture or crimes against humanity. And the facts here, even as alleged, do not amount to extreme forms of abuse like those in cases where ATS

---

[15] *See, e.g., Jama v. U.S. INS*, 343 F.Supp.2d 338, 353 (D.N.J. 2004); *see also, e.g., Abebe-Jira v. Negewo*, 72 F.3d 844, 845–46 (11th Cir. 1996) (two minor plaintiffs were stripped naked, bound, whipped severely, and threatened with death); *Paul v. Avril*, 901 F.Supp. 330, 331–35 (S.D. Fla. 1994) (plaintiffs were kidnapped, beaten with blunt objects and had their genitalia squeezed until they fainted from pain); *Xuncax v. Gramajo*, 886 F.Supp. 162, 184–85 (D. Mass. 1995) (plaintiffs were beaten, mutilated, and forced to watch their family members being killed).

violations have been found. Although Plaintiffs' allegations are serious, the specific conduct they allege did not violate *jus cogens* norms—the highest international law norm supported by widespread state practice of nations acting out of a sense of legal obligation. *See* Restatement (Third) of Foreign Relations Law § 102(2).

Even taken in the light most favorable to Plaintiffs, the sparse allegations in their Complaint do not suffice to show a violation of international law. That is: Plaintiffs entered the country without authorization. ECF 1 ¶ 85. They were initially detained together for three days in uncomfortable conditions before they were separated. *Id.* ¶¶ 86–87. D.C.B. was transferred to ORR and briefly housed at Heartland in Chicago—where he was required to clean bedrooms and bathrooms—for about four weeks before his mother was able to take custody of him. *Id.* ¶¶ 89, 91, 94. Mr. B. was detained for about 60 days before being reunited with his family, *id.* ¶ 95, and during his detention, his information about and communications with D.C.B. were limited, *id.* ¶ 96–98.

These allegations do not amount to a violation of treaty obligations or specific, universal, and obligatory international norms; nor do they rise to a level supporting claims of torture, inhumane acts, crimes against humanity, or persecution. *See C.D.A.*, 2023 WL 2666064 at *26–27 (dismissing similar ATS claims and citing numerous cases). This Court should therefore dismiss all claims purportedly arising under the ATS.

## V.    CONCLUSION

For these reasons, the United States requests that the Court dismiss this matter.

Respectfully submitted,

DAVID METCALF
United States Attorney

/s/ Susan R. Becker for GBD
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

/s/ Mark J. Sherer
MARK J. SHERER
Dated: August 27, 2025            Assistant United States Attorney