# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| D.C.B., minor child, and Mr. B., his father, | |
| *Plaintiffs*, | Case No. 2:25-cv-01924-KNS |
| v. | |
| United States of America, | |
| *Defendant* | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS

Plaintiffs Mr. B. and his son, D.C.B., through undersigned counsel, respectfully file this response in opposition to Defendant's ("United States" or "Defendant") Motion to Dismiss and Memorandum in Support (ECF Nos. 8, 8-1).

## INTRODUCTION

It is undisputed that on November 20, 2017, Plaintiffs presented themselves at the Eagle Pass Port of Entry to claim asylum. Defendant states that this took place prior to the implementation of the official Zero Tolerance Policy. Yet DHS itself states:

> Before implementation of the Zero Tolerance Policy, when CBP apprehended an alien family unit attempting to enter the United States illegally, it usually placed the adult in civil immigration proceedings without referring him or her for criminal prosecution. *CBP only separated apprehended parents from children in limited circumstances — e.g., if the adult had a criminal history or outstanding warrant, or if CBP could not determine whether the adult was the child's parent or legal guardian.* Accordingly, in most instances, family units either remained together in family detention centers operated by ICE while their civil immigration cases were pending, or they were released into the United States with an order to appear in immigration court at a later date.[1]

---

[1] DHS Office of Inspector General, "Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy" (September 27, 2018) at 2 (available at https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf) (emphasis added).

While the Motion's factual presentation (*see* Gov. Br. at 4-5) injects facts and documents into the record that appear nowhere in the Complaint, even still, the United States offers *no rationale whatsoever* for its decision to separate Mr. B. and D.C.B., describing it thus:

> [W]hen as here, DHS encountered a removable adult (Mr. B.) traveling with his removable child (D.C.B.), immigration officials had three possible responses: (1) release both into the United States; (2) detain the adult, and then either release the child to another parent or legal guardian, or transfer him to ORR as a UAC; or (3) detain both together by placing them at family detention center during their immigration proceedings. ... Here, the immigration officers chose the second option: to detain just Mr. B.— and because he would therefore be unable to care for his son (and no other parent was immediately available to take custody), they transferred D.C.B. to ORR for placement as a UAC.[2]

The Government's decision to separate a six-year-old boy from his father for no apparent reason, causing four weeks of pain and confusion for D.C.B. (until he was finally released to his mother), and 60 days of heartache for Mr. B., constitutes unspeakable and callous cruelty that must not go unredressed.

## ARGUMENT

### I.    Legal Standard

A. <u>Standard of Review Applicable to Pre-Answer Motion to Dismiss for Lack of Subject Matter Jurisdiction</u>

Plaintiff bears the "burden of persuasion" when subject matter jurisdiction is challenged under Rule 12(b)(1).[3] However, this burden is light; dismissal for lack of subject matter jurisdiction is only appropriate where the right claimed "is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666 (1974).

---

[2] Gov. Br. at 9, citing Exhibit 1 to the Motion (ECF No. 9-1).) To the extent this extrinsic evidence is used to argue rationale rather than present any additional facts relevant to the jurisdictional arguments here, it should be given no probative value. Nonetheless, to the extent that the Court considers the evidence attached to the Motion, Plaintiffs respectfully submit that they should be provided with an opportunity for discovery and a hearing.

[3] *Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir. 1991), *cert. denied,* 501 U.S. 1222 (citing *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977)).

In this Circuit, an FRCP 12(b)(1) motion may present a facial or factual attack. *See Mortensen,* 549 F.2d at 891. However, "a factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted."[4] Defendant has not filed an answer nor controverted Plaintiffs' allegations. Defendant, instead, contests the sufficiency of the pleadings. As no factual attack has been made, the motion is "by definition, a facial attack."[5]

In reviewing a facial challenge, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).[6] Thus, the court applies the standard of review applicable to a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party. *Id.* "The allegations must be considered as true." *Mortensen,* 549 F.2d at 891.

B.  Standard of Review Applicable to 12(b)(6) Motion to Dismiss for Failure to State a
    Claim

A motion to dismiss for failure to state a claim under FRCP 12(b)(6) tests the sufficiency of the allegations contained in the complaint. The moving party bears the burden of showing that no claim has been presented. Pursuant to Fed. R. Civ. P. 8(a)(2), a complaint is legally sufficient if it contains a short and plain statement of the claim showing that the pleader is entitled to relief. Rule 8(a)(2) requires the recitation of enough facts to state a claim to relief that is plausible on its

---

[4] *Id.* at 892 n.17; *Frompovicz v. Niagra Bottling, LLC*, 313 F. Supp. 3d 603, 608 (E.D. Pa. 2018) ("[A] defendant may mount a factual attack only after filing an answer."); *Cudjoe ex rel. Cudjoe v. Dep't of Veterans Affs.*, 2004 WL 1447834, at *1 (E.D. Pa. June 28, 2004), *aff'd* 426 F.3d 241 (3d Cir. 2005) (noting, in FTCA case, "as Federal Defendants have not filed an answer, their motion is necessarily a facial attack.").

[5] *Constitutional Party v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (district court erred by considering factual attack on 12(b)(1) motion before answer); *Long v. Se. Pennsylvania Trans. Auth.*, 903 F.3d 312, 320 (3d Cir. 2018) (same).

[6] Defendant's attempt to invoke the standard applicable to a factual challenge by attaching multiple documents to its motion—none of which it references in its legal arguments—must therefore fail. Should the Court consider these documents, it must provide Plaintiffs with an opportunity to obtain and submit equivalent evidentiary materials. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 177 (3d Cir. 2000) ("If the defendant contests any allegations in the pleadings, by presenting evidence, the court must permit the plaintiff to respond with evidence supporting jurisdiction ….") (citation omitted).

face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On a 12(b)6 motion, the court accepts as true all factual allegations in the complaint and

all reasonable inferences that can be drawn from them after construing them in the light most

favorable to the non-movant. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261

(3d Cir. 1994). The court's inquiry is generally limited to allegations contained in the complaint,

exhibits attached to the complaint and matters of public record. *Pension Benefit Guar. Corp. v.*

*White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## II.    The Court Has Subject Matter Jurisdiction Under the FTCA.

### A.    The Discretionary Function Exception Does Not Shield Defendant's Unconstitutional Acts of Separating Plaintiffs.

Because application of the discretionary function exception may turn on the facts relating

to the decisions made by the United States and the policies at issue, numerous courts have found

that it can be premature at the motion to dismiss stage to decide whether the discretionary

function exception applies.[7] Nevertheless, we will here address Defendant's claims that its

conduct was protected by the discretionary function exception ("DFE").

#### 1.    The Discretionary Function

The Defendant responds to the allegations in the Plaintiffs' complaint by arguing that

their conduct is protected by the DFE, which bars claims based on governmental actions that (1)

---

[7] See, e.g., *Peterson v. Martinez*, Case No. 3:19-cv-01447- WHO, 2020 WL 999832, at *8 (N.D. Cal. Mar. 2, 2020) (denying motion to dismiss based on discretionary function exception); *In re Katrina Canal Breaches Consolidated Litigation*, 471 F. Supp. 2d 684, 705 (E.D. La. 2007) ("the law mandates that this Court should not find as a matter of law at this juncture that all the decisions that have been made with respect to the MRGO were grounded in policy"); *Wesberry v. United States*, 205 F. Supp. 3d 120, 123 (D.D.C. 2016) (denying motion to dismiss without prejudice where it would be "premature to determine whether any binding mandate governs the agency's decision-making process").

involve an element of judgement or choice, and (2) involve public policy considerations. *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991) (citations omitted). In the Third Circuit, Defendant "has the burden of proving the applicability of the discretionary function exception." *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 (3d Cir. 2012). Here, Defendants have failed to meet that burden because its separation of Plaintiffs, at a minimum, "may" have been unconstitutional, and the Government lacks discretion to violate the Constitution. Even if the Government could establish on the face of the pleadings that its separation of Plaintiffs was constitutional, it lacked discretion to unlawfully transfer D.C.B. to Office of Refugee Resettlement's ("ORR") custody, separating him from his father, when he was not "unaccompanied."

>    2.  *The Government does not have the discretion to violate the Constitution.*

The DFE is inapplicable here because the Government does not have the discretion to violate the Constitution.[8] Mr. B. and D.C.B. allege their constitutional rights to family integrity

---

[8] *See, e.g., U.S. Fid. &; Guar. Co. v. United States,* 837 F.2d 116, 120 (3d Cir. 1988) ("[T]his court has developed several principles for determining whether governmental conduct is discretionary within the meaning of the exception. In the first place, conduct cannot be discretionary if it violates the Constitution, a statute, or an applicable regulation. Federal officials do not possess discretion to violate constitutional rights..."); *Prisco v. Talty*, 993 F.2d 21, 27 (3d Cir. 1993) (same); *Pooler v. United States*, 787 F.2d 868, 871 (3d Cir. 1986), abrogated on other grounds by *Millbrook v. United States*, 569 U.S. 50 (2013) ("[I]f the complaint were that agents of the government in the course of an investigation had violated constitutional rights or federal statutes, the outcome would be different since federal officials do not possess discretion to commit such violations."); *Dalal v. Molinelli*, 2021 WL 1208901, at *10 (D.N.J. Mar. 30, 2021) ("Courts have nearly unanimously held that federal actors lack discretion to violate an individual's constitutional rights."); *see also Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016) ("We hold that the FTCA's discretionary-function exception does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional provision."); *Plascencia v. United States*, 2018 WL 6133713, at *9 (C.D. Cal. May 25, 2018) (discretionary function exception does not apply when Plaintiffs allege injuries resulting from unconstitutional conduct in immigration-related detention).

Numerous other district courts, in highly analogous matters involving family separation, rejected the same argument the Government makes here and found that the Government did not have the discretion to violate the constitution. *See, e.g., A.P.F. v. United States,* 492 F. Supp. 3d 989 (D. Ariz. 2020) ("Because government officials lack discretion to violate the Constitution, the discretionary function exception cannot shield conduct related to the government's likely unconstitutional separation of plaintiffs.") (citations omitted); *Eueeda v. United States*, 2021 U.S. Dist. LEXIS 204200 (C.D. Cal. Apr. 27, 2021) ("Contrary to Defendant's arguments, the discretionary function does not shield conduct that violates the constitution.") (citations omitted); *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 590-97 (S.D.N.Y. 2022) (rejecting Government's discretionary function exception because Plaintiffs plausibly alleged constitutional violations); *C.M. v. United States*, 2020 U.S. Dist. LEXIS 252691 (D. Ariz. Mar. 30, 2020) ("Plaintiffs have plausibly alleged that the government's separation of their families violated their

and due process were violated. They were forcibly separated by Government agents without

explanation. Compl. at ¶ 87. During their forced separation, Government agents kept them

unaware of each other's location or wellbeing. *Id.* at ¶ 88, 96. Moreover, Plaintiffs clearly allege

that the Defendants' actions violated their constitutional rights. *See, e.g.*, *id.* at ¶¶ 2, 75.

District Courts reviewing materially identical allegations stated conclusively that the

Government ""directly and substantially burden[s]" a plaintiff's constitutional right "to family

integrity" when it "continu[es] to detain" them "in separate facilities for many weeks with only

periodic phone calls," which is precisely what the Complaint alleges.[9]

In this case, as in those discussed above, the allegations show that the Defendants

violated the Constitution–or at least that its actions "may have been" unconstitutional, which is

all that is required. *See, e.g., A.I.I.L.*, 2022 WL 992543, at *4 (finding Plaintiffs' allegations

regarding misconduct arising out of the separations, confinement conditions, and infrequency of

communication between parent and child sufficient to plead violation of constitutional rights).

3. *The Government had no discretion to declare D.C.B. 'unaccompanied' or send him to ORR.*

The Department of Health and Human Services ("HHS"), of which ORR is a part, has

statutory authority for the custody and care only of unaccompanied alien children. 8 U.S.C. §

1232(b)(1), (3). D.C.B. was accompanied by his father and Mr. B. was never criminally

prosecuted and was available to care for his child. Under 6 U.S.C. § 279(g), the Government

could not designate D.C.B. an "unaccompanied alien child" when a parent was, in fact, available

to care for him. It therefore lacked discretion under 8 U.S.C. 1232(b)(3) to take D.C.B. from his

---

constitutional rights, which is not shielded by the discretionary function exception."); *; A.I.I.L. v. Sessions*, 2022 WL 992543, at *4 , (D. Ariz. Mar. 31, 2022) ("Because constitutional violations are not subject to discretion, the discretionary function exception does not apply.").

[9] *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 501 (D.D.C. 2018); *see J.S.R. by and through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 741 (D. Conn. 2018) (even the government "agree[d] that a constitutional violation occurred when the [g]overnment separated children from their parents").

father. As noted, the Government lacks discretion to violate a federal statute or regulation. *See Gaubert*, 499 U.S. at 322.

Defendants' cited authority for housing a minor child away from his father is the Trafficking Victims Protection Reauthorization Act ("TVPRA") and its implementing regulations, which the Government argues allowed it to decide how to house unaccompanied noncitizen children in the "best interests of the child." Gov. Br. at 3 (citing 8 U.S.C. 1232(c)(2)(A); *id*. § 1232(b)(3); *id*. § 1232(a)(3); 6 U.S.C. § 279(2)(B)). But having entered the United States with his father, D.C.B. was not "unaccompanied"—that is, a child for whom "no parent or legal guardian in the United States is available to provide care and physical custody," 6 U.S.C. 279(g).[10] Congress has rejected Defendant's theory that children apprehended by DHS in the company of their parents could be considered "unaccompanied" and placed in ORR custody when "their welfare is not at issue." [11] Because Mr. B. and D.C.B. arrived in the United States together, Defendants lacked the discretion it argues the TVPRA permits and, to the extent it designated D.C.B. an unaccompanied alien child, violated the law. *See* 6 U.S.C. 279(g).

4. *The Government conduct alleged in the Complaint did not involve the type of policy-based decision-making shielded by the DFE.*

The government's decisions to limit information, communications, and tracking do not involve the type of policy-based decision-making shielded by the DFE. In *Ruiz v. United States*,

---

[10] See *Ms. L. v. U.S. Immigration & Customs Enf't,.*, 310 F. Supp. 3d at 1139 (S.D.Cal. 2018) (explaining that "true 'unaccompanied [noncitizen] children'" are those who arrive at the border without their parents, not those "detained with their parents at the border and who were thereafter separated from their parents"); *C.M.*, 2020 WL 1698191, at *3 n.4 (rejecting Government's argument "that parents who are 'amenable to prosecution' under immigration statutes are 'unavailable to provide care or custody' to their children" requiring the children's transfer to ORR custody); *Jacinto-Castanon*, 319 F. Supp. 3d at 495 n.2 (children "rendered unaccompanied by the unilateral and likely unconstitutional actions of defendants . . . are not true unaccompanied minors within the meaning of the" TVPRA).

[11] *See* House Comm. on Appropriations, Dep't of Homeland Sec. Appropriations Bill, 2006: Report Together with Additional Views (to accompany H.R. 2360), 109th Cong., 1st Session, 2005, H. Rep. 109-79 (expressing an expectation that the Government would release families, use alternatives to detention, or detain families together in appropriate spaces).

2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014), a father brought intentional infliction of emotional distress ("IIED") and negligence claims arising from CBP's detention of his four-year-old daughter, a U.S. citizen. The court rejected the government's DFE defense, reasoning that CBP officers' "treatment of" the child during her detention "cannot be said to be susceptible to policy analysis." *Id.* at *8. The court could not "discern how deciding to wait fourteen hours before contacting [the child's] parents and to only provide the child with a cookie and a soda over twenty hours could constitute a considered judgment grounded in social, economic, or political policies." *Id.* Rather, CBP's "actions appear more plausibly to be the result of negligence or laziness," and did not "warrant the application of the [DFE]." *Id.* Likewise, the government's failures here "do not involve consideration of public policy." *Id.*

B. The Due Care Exception Does Not Apply Because Defendant's Actions Were Not Mandated By Statute or Taken with Due Care.

Defendant next argues that its conduct is beyond the Court's reach because it was only following the law. Gov. Br. at 14 (quoting U.S.C. § 2680(a)). It asserts, erroneously, that the DCE applies "where a government employee's actions are authorized by statute or regulation."[12] This Court applies the "*Welch* test" for running a due care analysis.[13] First, the court must "determine whether the statute or regulation in question *specifically pr[e]scribes* a course of action for an officer to follow." *Welch v. United States*, No. 04-1863, 409 F.3d 646, 652 (4th Cir.

---

[12] *Id.* Defendant cites to three cases in support of this contention, two of which (*Borquez v. United States*, 773 F.2d 1050, 1053 (9th Cir. 1985) and *FDIC v. Citizens Bank & Trust Co. of Park Ridge, Ill.*, 592 F.2d 364, 366 (7th Cir. 1979)) are outside of this Circuit, and the third of which, *Pooler v. United States*, 609 F.Supp. 198, 202 (E.D. Pa. 1985), is distinguishable from the case at bar. *Pooler* was an action wherein it was alleged that VA officials conducting an undercover narcotics operation falsely arrested the Plaintiff as a result of a negligently conducted undercover investigation. *Pooler v. United States*, 609 F. Supp. 198 (E.D. Pa. 1985).

This Court found that *Pooler* was distinguishable from cases where an immigration officer's negligent decision to detain an individual was *not* protected as a discretionary function, because "compared to the decision of the INS agents…, the decision of a narcotics agent as to whether there is probable cause to search, seize, or arrest raises many more competing considerations." *Bradley v. United States*, 615 F. Supp. 206 (E.D. Pa. 1985) (quoting *Caban v. United States*, 671 F.2d 1230 (2d Cir. 1982)).

[13] *C.D.A. v. United States,* No. 21-469, 2023 U.S. Dist. LEXIS 52447 (E.D. Pa. Mar. 28, 2023) (citing *A.F.P. v. United States*, No. 21-780, 2022 U.S. Dist. LEXIS 122794, 2022 WL 2704570, at *14 (E.D. Cal. July 12, 2022)).

2005) (emphasis added). Second, "*if a specific action is mandated*, [the court] inquire[s] as to whether the officer exercised due care in following the dictates of that statute or regulation. If due care was exercised, sovereign immunity has not been waived." *Id.* (emphasis added). As Plaintiffs address further below, no statute or regulation mandated the Government conduct in this matter, nor did the government act with what could be described by a reasonable person as "due care."

    1. *No statute or regulation mandated the Government's conduct in this matter.*

      Here, Defendants fail to identify any statute or regulation that *mandated* the separation of Plaintiffs upon their entry into the United States, only asserting that the Defendants "had the statutory authority" to make determinations about the detention of asylum-seekers and to place D.D.C.B. in ORR care while Mr. B. was detained. Gov. Br. at 14, 15. This failure is fatal to the Government's argument.[14] Defendant's DCE argument is predicated on discretionary decisions, *i.e.,* the decision "to determine whether and where to detain [Plaintiffs] after they entered the country," which Defendant claims necessitated the removal of D.C.B. from Mr. B under the TVPRA. Gov. Br. at 3, 14. In other words, Defendant's argument requires the DFE to apply to the discretionary conduct in order for the DCE to apply to subsequent actions. Yet Defendant cites no case which allows it to cherry pick which exception applies to which elements of Plaintiffs' claims. No statute or regulation mandated the detention of Mr. B., and no statute or regulation mandated that Mr. B. be separated from D.C.B. pending that prosecution. That was

---

[14] *See, e.g., Gonzalez v. United States*, 2013 WL 942363, at *3-4 (C.D. Cal. Mar. 11, 2013) ("Because Plaintiff's detention was not the result of a statutorily prescribed course of action," his claims were not barred by the DCE.); *Watson v. United States*, 179 F. Supp. 3d 251, 270-71 (E.D.N.Y. 2016) (concluding the DCE, which "applies to situations where a statute or regulation requires an action to be taken," was inapplicable because the statutes the government cited did not mandate the conduct at issue—detention of plaintiff), aff'd in part, rev'd in part on other grounds, 865 F.3d 123 (2d Cir. 2017).

merely the decision of Defendant's agents. The separation was wholly of Defendant's own making.

2.  *The Government did not act with Due Care towards the Plaintiffs.*

The *Welch* test has two prongs, the second of which the Government does not address at all in their brief. Even if the Court finds convincing the Defendants' arguments towards the first prong, it should reject the Defendants' DCE argument because they do not make even a cursory attempt to argue that the Government conduct alleged in the Complaint was exercised with due care. 'Due care' implies at least some minimal concern for the rights of others." *Hatahley v. United States*, 351 U.S. 173, 181 (1956). And the Complaint is replete with unrebutted allegations that Defendant's conduct did not meet this threshold. Even if the Court were to consider the second prong, it would likely be impossible at this stage to find one way or the other whether the Government employees discussed in the Complaint exercised due care in the execution of any statute or regulation they purport to follow, in the absence of a more-developed factual record. *See C.D.A. v. United States*, No. 21-469, 2023 U.S. Dist. LEXIS 52447 at *n19 (E.D. Pa. Mar. 28, 2023)

C.  Plaintiffs' Complaint alleges tortious conduct by individual officers.

The Government claims that the Complaint "alleges a systemic claim based on alleged government-wide effort to inflict distress, rather than claims based on the acts of individual federal employees." Gov. Br. at 15. This Court should not find the Government's argument here compelling; it rejected a similar argument in *C.D.A. See C.D.A.*, No. 21-469, 2023 U.S. Dist. LEXIS 52447, at *50. Here, as in *C.D.A.*, the Complaint makes numerous references to the actions of individual Government employees and officials towards the Plaintiffs specifically.[15]

---

[15] *See, e.g.,* Compl., ¶ 9 ("U.S. government officials forcibly seized…D.C.B. from Mr. B.'s custody and separated them for over four weeks until their reunification."); ¶ 13 ("Plaintiffs bring this action under the FTCA and ATS

Insofar as the Complaint might fail to name certain Government employees, the plaintiffs can gather such details in discovery.[16]

    D.  <u>Plaintiffs' claims sound in state-law tort.</u>

        *1.  Plaintiffs' tort claims are not barred merely because Defendants' tortious conduct infringed on Plaintiffs' constitutional rights.*

Defendants assert that Plaintiffs' tort claims are barred insofar as they "sound in constitutional tort, not state-law tort[.]" Gov. Br. at 17. But Plaintiffs' IIED, NIED, Negligence, and Loss of Consortium claims *are* tort claims, not constitutional ones, such as a *Bivens* or other civil rights claim for violation of due process. The Complaint alleges that the Government violated its tort duties, causing Plaintiffs harm. The fact that Defendant's tortious conduct also violated the Constitution does not convert Plaintiffs' claims into "constitutional torts." Defendant cannot "re-categorize" Plaintiffs' allegations about poor conditions as standalone claims and then call them impermissible constitutional torts.[17]

---

seeking compensation for the extraordinary harms they suffered at the hands of ICE and ORR officials."); ¶ 23 ("DHS agents were responsible for separating Mr. B from his child. DHS employees also are responsible for supervising and managing detained individuals at CBP and ICE facilities."); ¶ 28 ("The vast majority of separated families, including Plaintiffs, were not informed by immigration officials when or how they would be reunited[.]"); ¶ 44 ("...CBP officers separated parents and children, including Plaintiffs…"); ¶ 45 ("Immigration officials frequently detained arriving parents and children, including Plaintiffs, in inhumane conditions."); ¶ 46 ("...immigration officials would inform parents, including Mr. B, that immigration officials would take their children."); ¶ 50 ("Parents, including Mr. B, begged immigration officials not to take their children, but immigration officials did so, often with callous disregard for the parents' and children's all too evident distress."); ¶ 52 ("Immigration officials flew children, including Plaintiff D.C.B., thousands of miles away from their parents…"); ¶ 87 ("The guards did not tell Mr. B. where they would be taking him, nor did they tell Mr. B. where they would be taking his six-year-old son."); ¶ 109 ("...the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress."); ¶ 115 ("By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs."); ¶ 124 ("The wrongful conduct of the federal officers referenced above directly and proximately caused [Plaintiffs'] injuries…"); ¶ 130 ("Federal officials intentionally inflicted severe physical or mental pain or suffering on Plaintiffs…"). [non-exhaustive list].
[16] *See C.D.A.*, No. 21-469, 2023 U.S. Dist. LEXIS 52447, at *50, quoting *Wilbur P.G. v. United States,* No. 21-cv-4457, 2022 U.S. Dist. LEXIS 135807, 2022 WL 3024319, at *6 (N.D. Cal. May 10, 2022) ("The fact that [the plaintiffs] are unable to name the individual Border Patrol officers who forcibly separated them and detention center employees without the benefit of discovery, should not be fatal to their action.")
[17] *See A.P.F. v. United States*, 492 F. Supp. 3d 989, 996-97 (D. Ariz. 2020); *citing C.M. v. United States,* 2020 WL 1698191, at *4, n.5 (D. Ariz. Mar. 30, 2020).

The Government's reliance on *FDIC v. Meyer*, 510 U.S. 471 (1994) is unavailing. *Meyer* held that the plaintiff's *Bivens* claim is a "constitutional tort" not cognizable under the FTCA such that the FTCA does not provide the exclusive remedy. *Meyer,* 510 U.S. at 477-78. The Court reasoned that a *Bivens* claim, in seeking to redress a constitutional violation, lacks a state-law analogue because it arises from the U.S. Constitution. *Id.* at 478. Plaintiffs here, by contrast, assert no *Bivens* or other constitutional claim, relying instead on tort violations with analogues under Texas and Illinois law. Despite the absence of constitutional claims in the Complaint, the Government styles Plaintiffs' allegations of inhumane treatment during detention as a "constitutional attack" on the conditions of their confinement. The Government's cases are distinguishable. In *Lang*, the Plaintiff filed a § 2241 petition, alleging that he was denied due process of law in his disciplinary hearings and was subjected to cruel and unusual punishment during his time in administrative segregation. *Lang v. Sauers*, 529 F.App'x 121 (3d Cir. 2013). Relying on Third Circuit precedent, *Lang* found that the proper avenue for relief was a *Bivens* suit. *Id.* at 124.

In contrast, here, Plaintiffs' allegations are based on Defendant's unlawful separation of families, including the tortious acts of Government agents during their detention. Plaintiffs have not asserted any claim based solely on the poor condition of the detention centers that constitutes a veiled constitutional attack. Where the Plaintiff in *Lang* did not assert any state torts, the Plaintiffs here assert exclusively state torts under the FTCA. Tort claims routinely proceed under the FTCA despite simultaneous constitutional violations.[18]

2. *Plaintiffs' FTCA claims have reasonable private analogues.*

---

[18] *See, e.g., Nurse*, 226 F.3d at 1002 (FTCA claim based on the Government's promulgation of discriminatory, potentially unconstitutional policies, can proceed past the motion to dismiss stage); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) (plaintiff's tort claims involving 1st and 4th Amendment violations may proceed); *Prisco v. Talty*, 993 F.2d 21, 26 n.14 (3d. Cir. 1993) (similar); *Limone v. United States*, 579 F.3d 79, 102 n.13 (1st Cir. 2009) ("[W]e do not view the FBI's constitutional transgressions as corresponding to the plaintiffs' causes of action—after all, the plaintiffs' claims are not Bivens claims.").

The Supreme Court has made clear that the private analog doctrine, which provides that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, must be interpreted broadly:

> While the area of liability is circumscribed by certain provisions of the Federal Tort Claims Act, *see* 28 U.S.C. § 2680, all Government activity is inescapably 'uniquely governmental' in that it is performed by the Government…. On the other hand, it is hard to think of any governmental activity on the 'operational level,' our present concern, which is 'uniquely governmental,' in the sense that its kind has not at one time or another been, or could not conceivably be, privately performed. There is nothing in the Tort Claims Act which shows that Congress intended to draw distinctions so finespun and capricious as to be almost incapable of being held in the mind for adequate formulation.[19]

### III.    Plaintiffs Sufficiently Plead Claims Under the FTCA.

A. The Independent Contractor Exception does not bar FTCA claims against Heartland employees.

The Government asserts that, "[t]o the extent Plaintiffs allege injuries resulting from the separation while D.C.B. was housed in Chicago, Illinois, as noted above, Heartland was an independent contractor, not a government employee, so the FTCA does not apply to its conduct[.]" Gov. Br. at 17, n.13. The Government, however, may still be liable for an independent contractor's tortious conduct if it "control[s] the physical conduct of the contractor in performance of the contract." *Logue v. United States*, 412 U.S. 521, 527, 93 S. Ct. 2215, 37 L. Ed. 2d 121 (1973). To ascertain this, the court must ask "whether [the contractor's] day-to-day operations [were] supervised by the Federal Government." *United States v. Orleans*, 425 U.S. 807, 815 (1976). In *C.D.A.*, this Court found it inappropriate and impossible to conclude at the motion-to-dismiss stage whether or not the independent contractor exception should apply to the analogous experience of the Plaintiffs at a detention center managed by independent contractors. *C.D.A.*, No. 21-469, 2023 U.S. Dist. LEXIS 52447, at *51.

---

[19] *Indian Towing Co. v. United States*, 350 U.S. 61, 67 (1955).

Here, the precise level of control that the Government asserted over the Chicago, Illinois ORR facility operated by Heartland Human Care Services ("Heartland") remains to be seen. It would be most appropriate here for this Court to allow, as it did in *C.D.A.* and other similar cases, the parties to engage in discovery regarding Heartland's daily operations before making a ruling on whether the independent contractor exception to the FTCA is applicable in this case. *See id.*; *see also Lao Ye v. United States*, 2023 WL 2263670, at *6 (D.N.J. Feb. 28, 2023).

    1. *Because the independent contractor exception does not apply, this Court must engage in choice-of-law analysis.*

To determine the law applicable to tort claims against the United States, the court first analyzes whether the United States would be liable under the "whole law," including choice-of-law rules, of the state in which the act or omission occurred. *Richards v. United States*, 369 U.S. 1, 11 (1962). Where acts or omissions are alleged to have occurred in multiple states, the FTCA requires that the court first determine which state's choice-of-law rules govern. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000). For multi-state torts, courts in this Circuit will generally choose the rules of the jurisdiction "containing the last significant negligent act or omission relevant to the FTCA." *Simon v. United States*, 341 F.3d 193, 196, 204 (3d Cir. 2003).

The Complaint alleges that Mr. B. and D.C.B. were subjected to Defendants' acts or omissions in Texas and Illinois. ECF No. 1 ¶¶ at 86-88, 95-100 (Texas); ¶¶ 89-94 (Illinois). At some point, this Court will necessarily have to address the choice of law question. However, Courts within this Circuit have generally concluded that, "when confronted with a choice of law issue at the motion to dismiss stage…it is more appropriate to address the issue at a later stage in the proceedings." *Graboff v. The Collern Firm*, No. 10-1710, 2010 U.S. Dist. LEXIS 118732, 2010 WL 4456923, at *8 (E.D. Pa. Nov. 8, 2010).

Thus, this Court should defer on the choice-of-law question at this stage, and assess the Plaintiffs' FTCA claims under all relevant states' laws. *C.D.A.*, No. 21-469, 2023 U.S. Dist. LEXIS 52447, at *60. Plaintiffs submit that the Court should allow analogous claims to proceed if they had been deemed sufficient within *any one* of the relevant states. *See id.*

       *i.  Plaintiffs plead claims under both Texas and Illinois law.*

       a.  <u>Plaintiffs plausibly state an IIED claim.</u>

Under both Texas and Illinois law, an IIED claim requires a plaintiff to establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006); *Ulm v. Memorial Med. Ctr.,* 964 N.E.2d 632,641 (Ill. App. Ct. 2012). Defendant argues that the Government's conduct was not extreme and outrageous because its employees were "performing their duties as permitted by law, which cannot constitute extreme and outrageous conduct." Gov. Br. at 18. Erroneously, Defendants state that "the decisions and conduct taken to enforce federal immigration law…cannot be considered extreme or outrageous under Texas law." *Id.* at 19. In support of this contention, Defendants points to a case asserting FTCA claims against federal narcotics officers, *Hart v. O'Brien*, 127 F.3d 424, (5th Cir. 1997), which involved the claim of false imprisonment. However, here, Plaintiffs raise no false imprisonment claims, nor do they raise claims against narcotics officers. The elements of Plaintiffs' claims do not grant comparable privileges to the Government employees whose conduct is at issue in this case.

Mr. B. and D.C.B. have sufficiently stated an IIED claim by alleging that the Defendants' conduct in forcibly separating them, prolonging their separation, and preventing their

reunification, was extreme and outrageous and caused Plaintiffs to suffer severe emotional distress. ECF No. 1 at ¶ 108-112. Courts applying Texas law have allowed IIED claims to proceed in circumstances analogous to these, where government employees separated family members.[20]

    b.  <u>Plaintiffs plausibly state an NIED claim.</u>

To state a claim for negligent infliction of emotional distress under Illinois law, the plaintiff must show that (1) they were "a bystander who [was] in a zone of physical danger," (2) they had "reasonable fear for [their] safety," and (3) their fear was caused by the defendant's negligence. *Rickey v. Chi. Transit Auth.*, 457 N.E.2d 1, 5 (Ill. 1983).

In Texas, a bystander claim falls within an exception to the general rule barring recovery for negligent infliction of emotional distress. *Chapa v. Traciers & Associates, Inc*., 267 S.W.3d 386, 398 (Tex. App. -- Houston [14th Dist.] 2008, no pet. Under this legal theory, mental anguish damages are recoverable for the contemporaneous sensory perception of a serious or fatal injury to a close relative. *Id.* To recover as a bystander, a plaintiff must establish that he (1) was located near the scene of the accident, as contrasted with one who was a distance away from it; (2) suffered shock as a result of direct emotional impact upon the plaintiff from a sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) was closely related to the primary victim of the accident. *United Services Automobile Association v. Keith*, 970 S.W.2d 540, 541-42 (Tex. 1998).

---

[20] *See M.D.C.G. v. United States*, 2016 WL 6638845, at *11–12 (S.D. Tex., Sept. 13, 2016) (allowing IIED claim to proceed where plaintiffs alleged trauma resulting, in part, from government agents' separation of mother and daughter for three days, and month-long separation of accompanying minor); see also *Villafuerte v. United States*, 2017 WL 8793751, at *13 (S.D. Tex. Oct. 11, 2017) (sustaining plaintiff's IIED claim for mental anguish suffered while detained in CBP custody).

Here, Mr. B. watched in shock as Government officials physically took his son, who was clinging to him, placed both in handcuffs and was taken from him. Compl. at 34. Six-year-old D.C.B. "was distraught when the guard physically separated them." *Id.* Because of the separation from his 6-year-old son, Mr. B. was caused significant mental anguish during his detention. Mr. B. "didn't sleep, didn't eat, I didn't know where I was, all I did was cry. They never gave me answers." *Id.* at 37. This rises to the level of NIED.

  c. <u>Plaintiffs plausibly state a negligence claim.</u>

Plaintiffs allege the type of harm needed to show damages under Texas and Illinois law. Plaintiffs need not allege physical injury to recover for negligence.[21] Nevertheless, Plaintiffs *do* plead that they suffered physical injury. The Defendants placed Plaintiffs in frigid rooms and deprived them of sleep, inflicting severe physical harm. Moreover, as described further below, studies indicate that toxic stress can have an adverse impact on brain architecture. In the extreme, especially during early, sensitive periods of brain development, the regions of the brain involved in fear, anxiety, and impulsive responses may overproduce neural connections while those regions dedicated to reasoning, planning, and behavioral control may produce fewer neural connections.[22]

  d. <u>Plaintiffs plausibly state a loss of consortium claim.</u>

Texas recognizes a claim for loss of consortium between a parent and a child in circumstances where a defendant physically injured the child's parent in a manner that would subject the parent to liability. *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990) (awarding

---

[21] *See Temple-Inland Forest Prod. Corp. v. Carter*, 993 S.W.2d 88, 91 (Tex. 1999) ("Whether a plaintiff can recover mental anguish damages without physical injury depends on both the nature of the duty breached and the quality of proof offered by the plaintiff.") (citations omitted); *Flores v. Baca*, 871 P.2d 962, 969 (N.M. 1994) (recognizing that "recovery is afforded for severe distress").

[22] Nat'l Sci. Council on the Developing Child, *Excessive Stress Disrupts the Architecture of the Developing Brain* 2 (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 3, Jan. 2014).

loss of consortium damages to child arising from "serious, permanent, and disabling injuries" to the parent). Plaintiffs allege that they suffered physical injury caused by Defendant's treatment of them while in custody, and that the separation itself caused them long-term psychological harm that manifested in physical injury. Defendant placed Plaintiffs in inhumane conditions, including frigid rooms, and depriving them of sleep inflicted severe physical harm. As described above, the Complaint sufficiently alleges that separation causes brain damage in children. This is sufficient under Texas and Illinois law. Moreover, Plaintiffs adequately allege facts demonstrating mutual dependence on one another, in that they lived together, faced economic hardships together, faced physical and emotional abuse together, fled to the United States together, and relied on one another for comfort and safety.

  e.  Plaintiffs' FTCA claims do not fail under Texas law because of the existence of privileged conduct.

Finally, Plaintiffs' FTCA claims do not fail under Texas law. In *C.D.A.*, this Court held that the plaintiffs' Texas state law claims "do not fail under Texas law because of the existence of privileged conduct." *C.D.A.*, No. 21-469, 2023 U.S. Dist. LEXIS 52447, at *61, 62. While the Government is entitled to invoke state law privileges as a defense against FTCA claims, *see, e.g.*, *Villafranca v. United States*, 587 F.3d 257, 261–62 (5th Cir. 2009) (raising civil privilege defense under Texas law), the Government cites no privileges relevant to Mr. B. and D.C.B.'s claims.

**IV.    Plaintiffs Sufficiently Plead Claims Under the Alien Tort Statute.**

The Complaint also sufficiently pleads claims under the Alien Tort Statute (the "ATS"), 28 U.S.C. § 1350. To state a claim under the ATS, a plaintiff must allege a violation of an

international norm, or principle of *jus cogens*,[23] that is specific, universal, and obligatory. *See Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). ATS claims have broadened beyond those recognized when the statute was enacted; courts now recognize offenses causing severe mental distress, including torture; cruel, inhuman, or degrading treatment; crimes against humanity; and prolonged arbitrary detention. *See, e.g.*, *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) (plaintiff alleged sufficient facts to establish torture causing severe mental suffering under ATS). Under Rule 12(b)(6), a properly stated ATS claim "must include enough factual allegations to enable a court to determine whether, if true, those facts plausibly … constitute a violation of the law of nations." *Chowdhury v. Worldtel Bangl. Holding, Ltd.*, 588 F. Supp. 2d 375, 379-80 (E.D.N.Y. 2008). The Complaint meets this standard. As set forth above, Defendant's conduct in separating a six-year-old boy from his father at the border and exposing them to months of mental and physical anguish, violates clear, long-standing *jus cogens* norms of international law.

A. <u>Family Separation Violates a *Jus Cogens* Norm of International Law.</u>

Jurisdiction under the ATS vests upon a plaintiff's showing of (1) a claim must be made by an alien; (2) alleging tortious conduct; and (3) that is in violation of the law of nations or treaties of United States. 28 U.S. Code § 1350. To determine whether the alleged tort violates the law of nations, courts look to norms set forth under international law. *Filartiga v. Pena-Irala*, 577 F. Supp. 860, 863 (E.D.N.Y. 1984) (under § 1350, "tort" means a wrong in violation of law of nations).

---

[23] *Jus cogens* norms are "a set of rules, which are peremptory in nature and from which no derogation is allowed under any circumstances." Hossain, Komrul, *The Concept of Jus Cogens and the Obligation under the U.N. Charter*, 3 SANTA CLARA JOURNAL OF INT'L LAW 1 (2005).

B.  Plaintiffs Plausibly Allege Claims Sufficient to Vest Jurisdiction in this Court Under the Alien Tort Statute.

1.  *This Court retains subject matter jurisdiction under the ATS.*

In the Complaint, Plaintiffs plead that the Government did indeed violate *jus cogens* norms. At this Rule 12(b)(1) stage, the Court "must consider the allegations of the complaint as true." *Mortensen*, 549 F.2d at 891. The court therefore should not dismiss Plaintiffs' ATS claims for lack of subject-matter jurisdiction.

2.  *Separating a child from his parent, when not in the child's best interest, violates* jus cogens *norms.*

Plaintiffs allege three bases for their claims under the ATS: (1) torture; (2) cruel, inhuman and degrading treatment; and (3) crimes against humanity. Defendant asks this Court to dismiss those claims because, although it will not say as much, Defendant contends the harms it inflicted on Plaintiffs were not sufficiently "bad" enough to constitute torts recognizable under the ATS. Yet Plaintiffs' well-pleaded factual allegations center around *how* they were treated under the supposed application of federal immigration law. Even before implementing the official Zero Tolerance Policy, Defendant inflicted pain and suffering on Plaintiffs and others like them by taking their children and parents away from them—not telling them where they were taking them, or if they would ever see them again—to deter immigration. Within weeks of taking office in 2017, President Trump announced several executive orders and policy initiatives to severely limit immigration to the United States.[24] Reports quickly began to circulate about an initiative to separate children from their parents at the southwest border as a way of deterring irregular migration. In mid-February 2017, just weeks after the presidential inauguration, CBP Commissioner McAleenan hosted a meeting with HHS officials in which the idea of family

---

[24] 82 Fed. Reg. 8793 (Jan. 30, 2017); 82 Fed Reg. 8799 (Jan. 30, 2017); 82 Fed. Reg. 8977 (Feb. 1, 2017).

separation was raised.[25] In early March, Secretary of Homeland Security John Kelly confirmed

that DHS was considering family separation, stating: "Yes, I'm considering [that], in order to

deter more movement along this terribly dangerous network. I am considering exactly that.

[Children] will be well cared for as we deal with their parents.[26] The next morning, Assistant

DHS Secretary for International Affairs Dimple Shah emailed Gene Hamilton, then-Counselor to

the DHS Secretary, asking to "discuss the 'separating families' issues raised at the morning

huddle."[27]

Soon thereafter, well before even the El Paso pilot project was announced, the spring of

2017 saw a spike in family separations. From November 2016 to March 2017, the percentage of

children in ORR custody as a result of family separation jumped *900 percent*.[28] It simply cannot

be denied that this conduct is "bad" enough to constitute torture. In any event, the relative

severity of Plaintiffs' trauma is a subject for discovery and expert testimony, and dismissal on

this basis would be premature.

    i.    *Plaintiffs Plead Claims for Torture.*

The Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or

Punishment ("CAT"), to which the U.S. is bound after ratifying and implementing it as domestic

law, prohibits torture under all circumstances.[29] Federal courts recognize that the right to be free

---

[25] Jacob Soboroff, *Separated: Inside an American Tragedy*, HARPER COLLINS PUBLISHERS (June 2020).
[26] Daniella Diaz, *Kelly: DHS is Considering Separating Undocumented Children from Their Parents at the Border*, CNN (Mar. 7, 2017), https://www.cnn.com/2017/03/06/politics/john-kelly-separating- children-from-parents-immigration-border/index.html.
[27] Email from Dimple Shah, Acting Assistant Secretary for International Affairs, Dep't of Homeland Security to Gene Hamilton, Senior Counselor at Homeland Security Secretary, Dep't of Homeland Security (Mar. 7, 2017), https://www.documentcloud.org/documents/6821391-DHS-18-0694- K.html#document/p85/a562363.
[28] U.S. House of Representatives Judiciary Committee, "The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos" (October 2020), available at
https://s3.documentcloud.org/documents/20400755/the_trump_administration_family_separation_policy_trauma_de struction_and_chaos.pdf.
[29] Under Article 1(1) of the CAT, "torture" is defined as:

from torture is a fundamental human right protected as a *jus cogens* norm of international law.

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1401 (2018) ("International human-rights norms

prohibit acts repugnant to all civilized peoples—crimes like genocide, torture, and slavery ….");

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 702 cmt.n (1987) (prohibition against

torture a fundamental human right and norm of international law). Numerous federal courts

recognize the severe physical and mental harm caused by forcible family separation. In *Ms. L*,

the court found:

> [T]here is ample evidence that separating children from their mothers or fathers
> leads to serious, negative consequences to children's health and development.
> Forced separation disrupts the parent-child relationship and puts children at
> increased risk for both physical and mental illness …. And the psychological
> distress, anxiety, and depression associated with separation from a parent would
> follow the children well after the immediate period of separation—even after
> eventual reunification with a parent or other family …. Children are at risk of
> suffering great emotional harm when they are removed from their loved ones. And
> children who have traveled from afar and made their way to this country to seek
> asylum are especially at risk of suffering irreversible psychological harm when
> wrested from the custody of the parent or caregiver with whom they traveled to the
> United States.

*Ms. L*, 310 F. Supp. 3d at 1146-47 (citations omitted). These harms affect parents and children

alike.[30]

## ii.  *Plaintiffs Adequately Allege Each Element of Torture*

---

> [A]ny act by which [1] severe pain or suffering, whether physical or mental, is [2] intentionally
> inflicted on a person [3] for such purposes as obtaining from him or a third person information or a
> confession, punishing him for an act he or a third person has committed or is suspected of having
> committed, or intimidating or coercing him or a third person, or for any reason based on
> discrimination of any kind, [4] when such pain or suffering is inflicted by or at the instigation of or
> with the consent or acquiescence of a public official or other person acting in an official capacity. It
> does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

CAT art. 1 (Dec. 10, 1984).

[30] *See id.* (separations "have been agonizing for the parents who have endured them.") (citations omitted); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 121-22 (D.D.C. 2018) (describing mental and physical harms suffered by adult asylum seekers separated from their children); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (separation from family members caused irreparable harm to both parents and children).

The first element of torture requires an act that causes severe pain or suffering, physical or mental. Physicians for Human Rights has determined, based on studies of separated families, that the "U.S. government's treatment of asylum seekers through its policy of family separation constitutes cruel, inhuman, and degrading treatment and, in all cases evaluated by PHR experts, rises to the level of torture."[31] The Complaint documents the extreme harms that Defendant's forcible separation caused Plaintiffs, which harms are especially pronounced in early childhood development and may affect the child's psychological health in the long-term.[32] D.C.B.'s young age at the time of separation—six years old—crucially affected the acuity of this suffering. Being in a foreign country alone and deprived of their only family member caused Plaintiffs immense, unquantifiable grief and agony. Plaintiffs' anguish was compounded since D.C.B. could not rely on supportive relationships to cope.[33] The disruption to Plaintiffs' parent-child relationship can, and did, increase the risk of enduring mental health issues, including anxiety, learning disorders and PTSD. Based on these acute and lasting harms resulting from the trauma of family separation, the United Nations included in its Convention on the Rights of the Child the directive that *children should never be separated from their parents unless it is in the child's best interest.*[34]

---

[31] *See* Report by Physicians for Human Rights, "You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation (Feb 2020), at 4-5; https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf.

[32] *See also* Nat'l Sci. Council on the Developing Child, *Excessive Stress Disrupts the Architecture of the Developing Brain* 2 (Harv. Univ. Ctr. on the Developing Child, Working Paper No. 3, Jan. 2014) ("Studies indicate that toxic stress can have an adverse impact on brain architecture. In the extreme, such as in cases of severe, chronic abuse, especially during early, sensitive periods of brain development, the regions of the brain involved in fear, anxiety, and impulsive responses may overproduce neural connections while those regions dedicated to reasoning, planning, and behavioral control may produce fewer neural connections.").

[33] Studies show that the "detrimental effects of forced and unexpected parent-child separation" occur "even when children are well cared for in a safe environment" much less an ice-cold cell with no one who speaks their language. *See* Kalina M. Brabeck *et al., The Psychosocial Impact of Detention and Deportation on U.S. Migrant Children and Families*, 84 AM. J. ORTHOPSYCHIATRY 496, 500 (2014).

[34] Conv. on the Rights of the Child, art. 9 (Sept. 2, 1990).

Plaintiffs' allegations satisfy the remaining elements of torture. Defendant's forcible separations were "intentional" (factor two); done to both "intimidate[e] or coerc[e] [Plaintiffs] or a third person"[35] for a "reason based on discrimination" (factor three); and inflicted pursuant to Defendant or its agents' "instigation … or with [Defendant's] consent or acquiescence" (factor four). *See* CAT, art. 1. As alleged, Defendant's separation of families was intentional. The principal motive for doing so was to deter and punish migrants specifically seeking asylum from crossing the southern border, and to coerce them to forfeit their rights to asylum.[36] The implementation of the policy was orchestrated by the highest levels of the United States government. Defendant's dog-whistle was crystal clear when the NSC explained that the purpose of the policy was to present "aliens with *multiple unsolvable dilemmas* to impact their calculus for choosing to make the arduous journey to begin with." Defendant's own watchdog, OIG, found that deterring migrants through intimidation was the force behind the Administration's "aggressive[]" promotion of the policy within the Justice Department.[37]

Plaintiffs further allege that Defendant's infliction of the policy was intended to coerce Plaintiffs into forfeiting bona fide asylum claims, and was conceived and implemented with a discriminatory purpose. Numerous members of the former administration, at the highest levels, laid bare the discriminatory motivations for the Family Separation Policy. Federal courts have

---

[35] The CAT's inclusion of third persons makes clear that severe pain and suffering need not be suffered by the intended target of the punishment, intimidation, or coercion to constitute torture. Thus, torture also includes pain or suffering inflicted on one person to change the behavior of others, such as Defendant intended when inflicting the Family Separation Policy on Plaintiffs to send a message to other Latin American migrants. *See* CAT, art. I.

[36] Defendant's conduct also sought to forfeit the robust procedural due process protections afforded to families. *See, e.g.*, *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 33-34 (1981) (state must afford affected parent a fundamentally fair procedure that may include the appointment of counsel when implicating parental rights).

[37]*See* Michael D. Shear et al., *infra* n.1. Then-Attorney General Sessions "and other top law enforcement officials understood that 'zero tolerance' meant that migrant families would be separated and wanted that to happen because they believed it would deter future illegal immigration." *Id.*

held that ATS torture claims are established where tortious acts are committed on groups with shared identities in order to intimidate them.[38]

 *iii.  Plaintiffs Plead Cruel, Inhuman and Degrading Treatment.*

 The right to be free from cruel, inhuman or degrading treatment ("CIDT") is also a universally accepted human rights norm and recognized claim under the ATS. *Abebe-Jira v. Negewo*, 72 F.3d 844, 847 (11th Cir. 1996), *cert. denied*, 117 S. Ct. 961 (1996).[39] The CIDT tort is defined as the intentional infliction of mental or physical suffering, anguish, humiliation, fear, or debasement against a person in the offender's custody or control that falls short of torture. *See In re South African Apartheid Litigation*, 617 F. Supp. 2d 228, 253 (S.D.N.Y. 2009). The "difference between torture and cruel, inhuman, or degrading treatment or punishment derives principally from a difference in the intensity of the suffering inflicted."[40]

 Here, there is no question that forcibly removing children from parents as a means of coercion and deterrence of asylum-seekers is universally condemned,[41] and that Defendant's forcible separation of Plaintiffs was an intentional infliction of mental suffering and anguish.[42] Indeed, as set forth above, Plaintiffs have alleged facts sufficient to constitute torture, otherwise meeting the CIDT standard. *See Doe I*, 349 F. Supp. 2d at 1320.

---

[38] *See Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322, 1352-53 (N.D. Ga. 2002) (Muslim victims of Yugoslavian War stated claim for torture under ATS by Defendant's acts carried out to intimidate and terrorize them because of their ethnicity).

[39] *See* CAT, art. 16 ("Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment which do not amount to torture as defined in article I").

[40] RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 702 (1987). When analyzing a claim for CIDT, the question is not whether the specific conduct "matches" conduct previously recognized to constitute inhumane treatment, because there is "no clear universally accepted guidance as to what constitutes" inhumane treatment; the question is "whether that conduct is universally condemned." *Doe I v. Liu Qi*, 349 F. Supp. 2d 1258, 1321-22 (N.D. Cal. 2004).

[41] *See, e.g.*, U.N. High Comm'r Hum. Rts., *Separating Children From Undocumented Migrant Parents is Shocking, Inhumane and Has Dire Effects on the Children* (Oct. 19, 2018), https://www.ohchr.org/en/press-releases/2018/10/separating-children-undocumented-migrant-parents-shocking-inhumane-and-has.

[42] *See In re S. Afr. Apartheid Litig.*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009) (recognizing that CIDT includes the intentional infliction of mental suffering and anguish); *Jane W. v. Thomas*, 2021 U.S. Dist. LEXIS 176106 (E.D. Pa. Sept. 15, 2021) (Defendant liable for CIDT for Plaintiffs' "severe and lasting physical and psychological injuries").

1. <u>Plaintiffs adequately Plead Crimes Against Humanity of Persecution and Inhumane Acts.</u>

A crime against humanity is any of a number of prohibited acts, including persecution and inhumane acts, "when committed as part of a widespread or systematic attack directed against any civilian population, with knowledge of the attack." Rome Statute of the International Criminal Court, art. 7, July 17, 1998, 2187 U.N.T.S. 3 ("ICC Statute"). The tort of crimes against humanity is actionable under the ATS.[43] The crime against humanity of persecution is defined as "the intentional and severe deprivation of fundamental rights contrary to international law by reason of the identity of the group or collectivity." ICC Statute, Art. 7(2)(g). Prohibited grounds include "political, racial, national, ethnic, cultural, religious, gender, or other grounds that are universally recognized as impermissible under international law." *Id.* at Art. 7(1)(h). Like persecution, when committed as part of a widespread or systematic attack against civilians, the crime against humanity of inhumane acts, including acts causing severe mental anguish, has attained *jus cogens* status. *Saravia*, 348 F. Supp. 2d at 1155; *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1334 (S.D. Fla. 2011).

The Complaint alleges that Defendant deprived Plaintiffs of their fundamental rights because of their shared identity with groups targeted by Defendant. The distinguishing feature of persecution is that the prohibited conduct is carried out with discriminatory intent.[44] The acts of the perpetrator must have been "aimed at singling out and attacking certain individuals on discriminatory grounds, by depriving them of the political, social, or economic rights enjoyed by

---

[43] *Mastafa v. Chevron Corp.*, 770 F.3d 170, 181 (2d Cir. 2014) (citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 256 (2d Cir. 2009)) (genocide, war crimes, and crimes against humanity may be asserted under ATS); *Mehinovic*, 198 F. Supp. 2d 1322, at 1352-53 ("Crimes against humanity have been recognized as a violation of customary international law since the Nuremberg trials" and is actionable under ATS).

[44] *Prosecutor v. Kupreškić*, Case no. T-95-16-T, Judgment, ¶ 621 (Int'l Crim. Trib. For the Former Yugoslavia Jan. 14, 2000) (persecution is "the gross or blatant denial, on discriminatory grounds, of a fundamental right, laid down in international customary or treaty law, reaching the same level of gravity as [other crimes against humanity].")

members of the wider society." *Id*. ¶ 634. Even where exercised under color of law, persecutory

and inhumane acts are illegal under international law. *Id.* ¶ 558. As noted *supra,* the allegations

in the Complaint satisfy this standard: that Defendant deliberately discriminated against

Plaintiffs and other Latin American and Black, indigenous, and peoples of color to deprive them

of their fundamental constitutional rights. Plaintiffs are civilians belonging to targeted civilian

populations of countries south of the United States' border, including Brazil. Defendant

subjected these populations to inhumane acts in an attack that was both widespread and

systematic in scale.

In sum, the Court should sustain Plaintiffs' claims for torture, cruel, inhuman and

degrading treatment, and crimes against humanity.[45] The law of torture and crimes of that

dimension must evolve to recognize when atrocities are committed and hold those who directed

those atrocities accountable. The forcible separation of children from parents, when not done in

the best interest of the child, is an atrocity and must be recognized as such.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny

Defendant's motion in its entirety.

Dated: September 10, 2025                      Respectfully submitted,

                                               */s/Karen L. Hoffmann*
                                               Karen L. Hoffmann, Esq.
                                               Ellenberg Law Group

                                               *Attorney for Plaintiffs*

---

[45] For the reasons above, Plaintiffs maintain that they have plausibly pleaded these claims and each cause of action. However, to the extent that the Court were to determine otherwise, Plaintiffs request leave to amend their pleading. *See Ardo v. Pagan*, No. CV 18-5217, 2019 WL 13089421 (E.D. Pa. Nov. 22, 2019) (Smith, J.) ("Generally, 'the court should freely give leave to amend when justice so requires'" (quoting Fed. R. Civ. P. 15(a)(2) (alterations deleted)).